No. 22,411.

W. E. MIDDLETON and A. D. LUDLOW, Partners, etc., *Appellants,* v. THE CITY OF EMPORIA, *Appellee.*

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS—*Method of Letting Contracts for Public Improvements.* In the absence of a statutory provision as to the method of letting contracts, a city of the second class may contract for the work through a public letting after an advertisement of the same. The authority to the city to have the work done carries with it the discretion to contract for the work in any practicable method that will safeguard the public interests.

2. SAME—*Public Improvements—Advertisement for Bids—Bid Accepted by City Constitutes a Contract.* Where the city advertised for proposals from bidders for the work according to full and definite plans and specifications furnished to bidders, and a proposal made by a bidder was formally accepted by the mayor and commissioners of the city, the acceptance of the bid concludes a binding contract, notwithstanding the fact that it was stipulated that the contract so made should subsequently be reduced to writing.

3. SAME—*Defaulting Bidder—Cannot Recover His Deposit Accompanying His Bid.* A deposit which accompanied the bid as a guaranty of the good faith of the bidder and that he would enter into a formal contract and give a specified bond for the faithful performance of the work contracted for, cannot be recovered back by a bidder who fails to comply with the requirements of the agreement resulting from the accepted proposal.

4. SAME—*Forfeiture of Deposit Money—Damages.* After the bidder had notified the city that he was unable to give the bond provided for and carry out the contract, it was competent for the city authorities to declare the deposit forfeited to the city and apply the same to the

actual damages sustained by the city through the failure of the bidder to perform his agreement.

5. SAME—*Defaulting Bidder Liable to City for Actual Damages.* The forfeiture and application of the deposit did not relieve the bidder from liability to the city for the actual damages suffered by reason of the breach of the agreement to give the bond and complete the work.

6. SAME—*Defaulting Bidder—Measure of Damages Sustained by City.* After the default of the bidder, the city accepted the next lowest bid without readvertising or a reletting of the contract, which under the circumstances appeared to be the lowest bid the city could hope to obtain. *Held,* that the difference between that bid and the accepted bid made by plaintiff, is a proper measure of the damages sustained by the city.

7. SAME—*Contract for Improvements—Estimates by Non-resident Engineers.* Following *Abilene v. Lambing,* 78 Kan. 484, 96 Pac. 838, it is held that the fact that the city employed nonresident expert engineers to make estimates, plans and specifications for the work, instead of having them made by the city engineer, who performs the ordinary duties of the position, did not impair the validity of the contract for the work made by the city.

Appeal from Lyon district court; WILLIAM C. HARRIS, judge. Opinion filed January 10, 1920. Affirmed.

*W. W. Parker,* of Emporia, *Henry E. Dean,* and *Thomas A. Pollock,* both of Kansas City, for the appellants.

*S. S. Spencer,* and *Gilbert H. Frith,* both of Emporia, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: The plaintiffs sued to recover from the city of Emporia the amount of a deposit which accompanied a bid they made for the extension and improvement of the waterworks system of the city. In its answer, the defendant asked judgment for $3,242.29, the difference between the amount of the deposit and the damages sustained by the city through the failure of the plaintiffs to carry out the contract resulting from the acceptance by the city of plaintiffs' proposal. The court found against the plaintiffs and awarded judgment in favor of defendant on its cross petition in the sum of $3,242.29. From this judgment, plaintiffs appeal.

It appears that bonds of the city to the amount of $150,000 were voted by the electors for the improvement of its water-

works system, and the firm of Black & Veatch, engineers of Kansas City, Mo., were authorized and employed by the city to make surveys, prepare plans and specifications for the work, and to supervise the construction of the plant. Plans and specifications were prepared by the engineers, including instructions to bidders, and proposals were invited. In response to the invitation, there were six bids received, ranging from $65,792.49 to $77,992.70. The plaintiffs' bid was the lowest, and the next lowest bid was made by McCoy & Taylor, for the sum of $70,534.78. The proposal of plaintiffs, which was accompanied by a deposit of $1,500, was accepted by the city on March 24, 1916. Each bidder was required to inclose with his bid a certified or cashier's check to be left with the clerk as a guaranty of good faith, to be forfeited if he failed to enter into a formal contract and give the required bond for the faithful performance of the work. In relation to the deposit, it was stated:

"In default of the performance of any of the conditions on our part to be performed, the amount of a check which we have this day deposited with the city clerk, shall, at the option of the commissioners, be absolutely forfeited to the city of Emporia, but otherwise the check shall be returned to Middleton & Ludlow," etc.

It was further stipulated that the bidder would enter into a contract within ten days from the acceptance of the bid and give a bond equal to sixty-five per cent of the amount of the bid, to secure the performance of the contract in accordance with the plans and specifications. On April 3, 1916, the plaintiffs notified the city commissioners that they were unable to give the required bond, but they expressed a willingness to do a small part of the work. After receiving this notice and on April 6, 1916, the mayor and commissioners declared a forfeiture of the deposit and directed that it be placed in the city treasury. On the same day, they proceeded to complete the letting. There was testimony to the effect that upon a consultation with the engineers, it was determined that as prices of material had advanced, there was no prospect that a lower bid than that of McCoy & Taylor, the next lowest bid which had been made, would be received by a readvertising and reletting. It was the opinion of all that a postponement for another notice and letting, with the constantly increasing

prices, would cause the city to pay more for the improvement than the amount of the next lowest bid, and thereupon the bid of McCoy & Taylor was accepted. It appears that there was a marked advance in the prices of steel, cement, and lumber, after March 24, 1916, and these were the principal materials to be used in the work.

Although questioned, there can be no doubt of the power of the mayor and commissioners of the city to contract for such an improvement through a public letting, and this plan has been generally followed by municipalities of the state, time out of mind. . In some instances it is specifically required by statute, but no method is prescribed in contracts of the kind in question. It is not necessary that the statute should expressly provide for a public letting, or prescribe the manner for contracting for an improvement. The authority to the city to have the work done carries with it the discretion to have it done in any way in which it is practicable and convenient, and in acting under such authorization the city is entitled to contract and bind itself and to all the rights and remedies of private parties. (2 Dillon on Municipal Corporations, 5th ed., § 815.) In such a case the protection of the public is the first consideration, and probably no method employed better safeguards the public interest than a public letting after due advertisement.

It is argued that a contract relation did not exist between the plaintiffs and the city; that is, that the acceptance of plaintiffs' bid did not constitute a contract. Every element necessary to a complete contract existed; the city asked for proposals, based on definite plans and specifications, which were furnished to every bidder; and plaintiffs made a proposal which the city formally accepted. The invitation for proposals and the proposals themselves were only negotiations or steps taken towards a contract, but when the acceptance of a proposal was made by the city, a binding contract was concluded. This was more than a step in the negotiations, and more than an agreement to enter into a contract. The notice and specifications stipulated that a formal contract should be executed and security given for faithful performance, but everything was definitely provided for in the agreement resulting from the acceptance. It is true that the writing would re-

Middleton v. City of Emporia.

duce the terms of the agreement to a more concise and convenient form, and at the end of such a writing a reference is ordinarily made to the plans and specifications in order that all the terms and conditions specified shall be embraced in the contract. Cases may be found where, because of a statute or an express stipulation, a contract is not complete until it is committed to writing and formally signed, or has had the approval of some person indorsed thereon, or where there is a manifest intention that a writing is a condition precedent to the taking effect of the contract. (*Edge Moor Bridge Works v. Bristol,* 170 Mass. 528; 6 R. C. L. 618.) . Here there are no such provisions or restrictions and, in the absence of these or something of the kind, a binding agreement may be made by a proposal and acceptance. In *Denton v. City of Atchison,* 34 Kan. 438, 8 Pac. 750, it was said:

"A city advertised for proposals for the building of certain sidewalks according to plans and specifications on file in the office of the city engineer, and in response thereto a contractor made a proposal to build the walks at a certain price in accordance with such plans and specifications, and under the direction and to the acceptance of the city engineer, which proposal was duly accepted by the mayor and council of the city. *Held,* That the proposal of the contractor being definite and the acceptance by the city being unqualified, they together constituted a contract between the parties, and that the plans and specifications referred to in the proposal became a part of such contract."

The deposit was required, as we have seen, to secure *bona fide* bids, and so that the bidder would enter into a formal contract with a sufficient bond to guarantee full performance of the contract within the time and on the terms specified. It is immaterial whether the deposit so made is regarded as a forfeiture or liquidated damages. It was collateral to the contract that was made, and a guaranty that the bidder would observe the specified requirements, and besides, it turned out that the deposit was not treated as liquidated damages but was properly applied as a credit on the actual damages sustained by the city through the failure of the plaintiffs to comply with the specified requirements and carry out the contract that was made. (*Willson v. M. & C. C. of Baltimore,* 83 Md. 203; 8 R. C. L. 576.) It was provided that the deposit was to become the property of the city if the plaintiffs did not in good faith

and within ten days execute a formal contract and give the surety bond as specified. It has been said—

"Where a bidder accompanies his bid, for the performance of a public work, with the deposit of a certain sum under an agreement to forfeit the sum deposited in case of his neglect or refusal to enter into the contract for the work, and without default on the part of the board, he fails to execute the contract, he cannot recover back his deposit, and the board may declare the same forfeited." (2 Dillon on Municipal Corporations, 5th ed., § 810.)

The plaintiffs failed to give the surety bond and, having expressly informed the city of their inability to do so, no notice to them of the appropriation of the deposit was necessary.

The default of the plaintiffs, giving rise to the forfeiture of the deposit, in the preliminary agreement, did not relieve the plaintiffs from liability for the actual damages sustained from their failure to carry out the contract which they had made. As we have seen, there was a binding contract between the parties, and a violation of its provisions by the plaintiffs, and no reason is seen why a party who breaches a contract is not answerable in damages for the actual loss resulting from the breach.

There is a contention that the actual loss sustained by the city was not properly established. The difference between the plaintiffs' bid and that of the next lowest bidder, to whom the contract was let, was proven. That was the actual loss occasioned by plaintiffs' default, and it does not appear that it could have been lessened if the city had taken a different course than was pursued. Apparently, the city officers acted in the best of faith and, in view of the evidence relating to the rise in prices of material, the contract let to McCoy & Taylor was as favorable a contract as the city could hope to obtain. There was no occasion for a readvertising and a reletting. The city already had a series of bids made after public advertisement a few days before, the good faith of which is not drawn in question. Eliminating the bid repudiated by plaintiffs, that of McCoy & Taylor was not only the next lowest bid, but it turned out in fact to be the lowest responsible bid that had been made, and since McCoy & Taylor did not object to the delay in the acceptance of their bid, or to the fact that the bid of plaintiffs was first accepted, the plaintiffs have no right to object. It

does not appear that the improvement could have been made for a smaller amount than the bid that was finally accepted. If the plaintiffs had carried out their contract and performed the work in accordance with its terms, the city would have saved the difference between their bid and the amount they were required to pay McCoy & Taylor. That, therefore, appears to be the measure of the actual loss sustained by the city. The difference was $4,742.29, and the court credited plaintiffs with the amount of the deposit forfeited to the city, and awarded judgment against plaintiffs for the net loss sustained, $3,-242.29.

There is a further contention, that as the plans and specifications and preliminary estimates were not prepared by the legally appointed city engineer, that a legal contract could not be made between the city and plaintiffs. That work was done by Black & Veatch of Kansas City, Mo., and not by the one who had been appointed and was performing the ordinary duties of city engineer. The investigations, estimates, plans and specifications for a waterworks plant were highly expert and required skill and experience not ordinarily possessed by engineers appointed by the municipalities of the state. The qualifications of those chosen by the city are not questioned, and while they could not perform the general duties of city engineers, nor any duties except those connected with the proposed improvement, yet as to these they were in fact city engineers. This has in effect been decided in *Abilene v. Lambing,* 78 Kan. 484, 96 Pac. 838. The cited case of *Wyandotte County v. Davis,* 92 Kan. 672, 141 Pac. 555, is based upon a different statute and is not controlling. The legislature evidently foresaw the necessity for the designation of persons with extraordinary skill for important works of the character in question, and provided that appointive officers must be *bona fide* residents of the city, "except that the city may hire nonresident expert employees when deemed necessary by the board of commissioners." (Gen. Stat. 1915, § 1853.) The city engineer is not questioning the right or power of the nonresident engineers in the premises, and there is no challenge of their right by the attorney-general or county attorney to exercise the powers placed upon them by the city, and it is hardly becoming in

plaintiffs, who made their bid with full knowledge that the estimates, plans and specifications were all made by Black & Veatch, to object to them upon the ground of nonresidence. We conclude that the fact that the estimates, plans and specifications were made and signed by the nonresident engineers, did not impair the validity of the contract.

Judgment affirmed.

DAWSON, J. (dissenting in part) : With much that is said in the opinion I agree. But I think that when a contractor is invited to bid upon a proposed letting of construction work and is required to post a sum of money with his bid as an evidence of his good faith and as a pledge that he will make a formal contract to do the work if he is awarded the contract upon his bid, the sum of money thus posted or pledged by the successful bidder is merely liquidated damages. If the successful bidder fails to come forward and make the formal contract which by his bid he promised to make, the extent of the consequences of his failure to do so is already measured by the parties themselves, and is paid in full when the recanting contractor's pledged money is appropriated by the party who accepted his bid and awarded him the contract. I take judicial notice, also, that this view of such incidents is the one commonly understood and followed throughout this state by official boards and officers having contracts to let, and by contractors who bid for such contracts.

PORTER, J.: Concurs in the foregoing partial dissent.