No. 22,853.

THE AMERICAN TANK COMPANY, *Appellee,* v. THE REVERT OIL COMPANY, *Appellant,* et al.

### SYLLABUS BY THE COURT.

1. CONTRACT—*For Construction of Oil Tank—Implied Warranty.* A tank company which, under contract with an oil company, furnishes material and labor and constructs a 1,600-barrel tank for the storage of oil on the oil company's premises, impliedly warrants that the tank shall be reasonably fit for the purpose for which it was sold.

2. SAME — *Breach of Warranty — Action for Damages — Negligence of Warrantor Not an Issue.* In an action for damages for breach of such a warranty, negligence of the manufacturer is not an issue, and it is no defense that the tank company used reasonable care in selecting material for the tank and in constructing it.

3. SAME—*Action for Damages for Breach of Warranty—Evidence of Behavior of Other Tanks of Same Class.* In an action for damages resulting from negligent construction of such a tank, comparative evidence sustaining and refuting the charge of negligence should be confined to behavior of tanks of the same class, produced by the same manufacturer.

Appeal from Butler district court; ALLISON T. AYRES, judge. Opinion filed April 9, 1921. Reversed.

*Robert Stone, George T. McDermott,* both of Topeka, *John Madden, C. E. Cooper, Chester I. Long,* and *Austin M. Cowan,* all of Wichita, for the appellant.

*J. M. Pleasant,* and *George J. Benson,* both of El Dorado, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the tank company to foreclose a mechanic's lien for labor and material furnished in the erection of oil tanks for storage of oil produced on the oil company's premises. The oil company counterclaimed damages occasioned by collapse of a tank filled with oil. The mechanic's lien feature of the litigation has been adjusted. The counterclaim was denied, and the oil company appeals.

The tank which collapsed was a 1,600-barrel tank. The released oil took fire from one of the oil company's engines, and

Tank Co. v. Oil Co.

much property was destroyed. The counterclaim was based, first, on an implied warranty that the tank was reasonably suited for the purpose for which it was built, and second, on negligent construction of the tank. The reply was: first, that by local custom of the oil field no implied warranty accompanied a contract for the sale of such tanks; second, that the tank was a specific article of known description, manufactured and sold as such, and consequently was ordered by the purchaser on its own judgment and at its own risk; and third, that collapse of the tank was occasioned by the oil company's negligence. A peculiar fourth defense was pleaded, which does not require consideration.

The contention that the law relating to implied warranty was abrogated by custom of the particular oil field, was prudently abandoned, in view of the decision of this court in the case of *Manufacturing Co. v. Merriam,* 104 Kan. 646, 180 Pac. 224. The court instructed the jury the tank company impliedly warranted the tank was of sound material, properly assembled, that it was free from latent defects, and that it was reasonably fit to retain oil; and it may as well be said here, for the benefit of the court at the next trial, that while the instruction might have been improved, it was properly given.

The tank company did not contract to sell a specified completed chattel dealt in by recognized trade name; it contracted to furnish material and labor and build for the oil company a structure to hold a specified quantity of oil. If doubt about the nature of the transaction existed, it would be removed by the verified mechanic's lien statement filed by the tank company. The statement declared that the oil company was the owner of an oil and gas mining lease of described land, and that the tank company, having furnished materials and performed labor "in the construction and erection of tanks . . . for the storage of oil produced on said lease," claimed a lien. Therefore, cases such as that of *Ehrsam v. Brown,* 76 Kan. 206, 91 Pac. 179 (sale of two "Wolf gyrators"), are not in point. Besides that, a sale of a brand of manufactured article includes a contract that the article shall possess the qualities implied by the brand. "Gold Drop Flour," being a brand of flour, must make bread. (*Kaull v. Blacker,* 107 Kan. 578, 193

Pac. 182; *Bunch v. Weil*, 72 Ark. 343, "Capital Brand" flour "Extra Fancy.") A tank is, by definition, a receptacle for liquid. An order given for an oil tank makes known to the builder the purpose for which it is required—storage of that kind of liquid—and a 1,600-barrel oil tank must be able to withstand the pressure of the designated quantity of oil under ordinary conditions of use. Implied warranty cases to this effect are numerous. Those which follow are illustrative. A whisky barrel must not permit loss of whisky by leakage (*Poland v. Miller et al.*, 95 Ind. 387) ; a fertilizer must give to land additional capacity to produce crops (*Wilcox, Gibbs & Company v. Hall.* 53 Ga. 635) ; a potato digger must dig potatoes (*Hallock v. Cutler*, 71 Ill. App. 471) ; a mine pump must be able to pump water out of a mine (*Getty et al. v. Rountree*, 2 Pinney [Wis.], 379) ; a self-feeder must feed a threshing machine (*Parsons Co. v. Mallinger*, 122 Iowa, 703) ; a piano must be so constructed that it may be used as a musical instrument of that class (*Little v. G. E. Van Syckle & Co.*, 115 Mich. 480) ; a vessel built for a buyer must be seaworthy (3 A. L. R. 622, Annotation) ; a silo must preserve ensilage (*Indiana Silo Co. v. Harris*, 134 Ark. 218) ; an automobile must be capable of use as a vehicle (*Harvey v. Buick Motor Co.*, 177 S. W. 774) ; a moving-picture screen must possess suitable reflecting qualities (*East End Amusement Co. v. Atmospheric S. Co.*, 171 N. Y. Supp. 283).

The tank stood up for only a short time, during which it was used in the customary manner, and was filled and emptied nine times. On August 10, 1918, the tank company re-coopered it, which should have improved it, and on August 15 it burst. There was evidence the tank was negligently constructed, and there was evidence to the contrary. The tank company produced as a witness a former employee of the oil company, who testified that on the day before the accident he saw two employees of the oil company, Liggett and Banta, driving down hoops of the tank while it was nearly full of oil. There was evidence that coopering done below the oil level greatly endangers stability of a tank. The oil company produced Liggett as a witness, who testified that he was never on the tank, that he and Banta were not on the tank the day before the accident, or at any other time, and that they never coopered the tank.

Although the court gave the instruction referred to relating to implied warranty, it did not state to the jury what would constitute a breach of warranty, or the consequences, but merged the oil company's two defenses in an instruction relating to the tank company's negligence. The material portion of the instruction follows:

"If you should find from the evidence that the plaintiff was negligent in the construction of this tank or the repairing of same, in one or more of the particulars specified, and that by reason thereof the tank burst under the pressure of the oil, then the terms of the implied warranty on the part of the plaintiff would be broken, and it would be liable for the damage sustained by the defendant by reason thereof, unless the defect was so obvious that the defendant, in the exercise of reasonable care and precaution for its own protection, could, and should have, observed the same."

The instruction was erroneous, and the error was intensified by other instructions.

Efficiency of the tank could be demonstrated in no way except by use, and the court properly instructed the jury that the oil company was permitted to use the tank for a reasonable time, to determine its suitableness for the purpose for which it was built. Assuming the tank collapsed within that time, the tank company's liability became absolute, unless it could establish its defense that the accident occurred through fault of the oil company. The tank did not stand up, the warranty was broken, and due care in selecting material and in building the tank was not a defense. A division of authority on this subject is noted in Williston on Sales, section 237, page 317. Without attempting to formulate a general rule, it may be said that diligence on the part of the manufacturer is unimportant in a case of this character.

Unless the engagement of the warranty that the tank was reasonably fit to use were unqualified, it was no engagement at all. Aside from the contract, the seller was liable for consequences of failure to exercise care in designing the article, in selecting materials for it, and in manufacturing it. The counterclaim contained a separate cause of action predicated on that liability, the validity of which may not be doubted. Beyond the subject of negligence lay the subject of fulfillment of purpose. Unless hidden defects frustrating purpose were embraced, the warranty had no function to perform, and a choice

must necessarily be made between warranty and no warranty. It would be idle to debate the subject of existence of a warranty that an article manufactured and sold for a specific use must be reasonably adapted to that use. In the present case there was but one test of performance of the warranty: Would the hoops and staves of the tank, as the builder fashioned them,. withstand the stress of 1,600 barrels of oil? The nature of the warranty was such that it virtually extended to identity of the thing sold. If the tank would not hold oil, it was not really the thing contracted for. Indeed, breach of warranty and breach of contract of sale touch here so closely that the two are distinguishable more in theory than in practical consequence (*Flour Mills Co. v. Moll,* 106 Kan. 827, 189 Pac. 940). Whether the requirement that the tank should hold oil be regarded as a condition, or as a warranty of identity, or as a warranty of fitness for purpose, it was necessary the requirement be met, and it was immaterial to the buyer how much or how little care was devoted to selection of material and to manufacture.

The leading English case announcing the rule just stated is *Randall v. Newson* (1877), 2 Q. B. D. 102, and the leading American case is *Rodgers & Co. v. Niles & Co.,* 11 Ohio St. 48. In the case of *Wisconsin Red Pressed Brick Co. v. Hood,* 67 Minn. 329, it was said the doctrine of those cases makes the manufacturer an insurer. The criticism is sufficiently answered by the supreme court of Tennessee, in the case of *Tennessee River, etc., Co. v. Leeds,* 97 Tenn. 574. A cast-iron piston head was ordered of a manufacturer to replace a broken one which the manufacturer had made. The new piston head was apparently perfect, but in about two months it broke. The casting contained blowholes, which could not be detected by observation or test. There was evidence it is impossible to make a casting without blowholes; but those in the new casting were of such unusual size they made it exceptionally defective. The trial court instructed the jury on the theory of due care by the manufacturer. In the opinion of the supreme court it was said:

"This charge is erroneous. It assumes the non-liability of a manufacturer for latent defects, if proper tests had been applied to the discovery of such defects by him, and they had not been found. This is the rule when applied to the purchaser of machinery who is sued by persons injured in its use, but is not the rule as applied to the manufacturer who

makes and sells to a purchaser machinery for a special purpose. In that case the manufacturer warrants against latent defects that the machinery is reasonably fit for the use to which it is to be applied. He does not warrant (in the absence of express contract) that it is perfect, or the best for that purpose, but only that it is reasonably fit and proper for the use designed." (p. 576.)

In the case of *Nixa v. Lehmann*, 70 Kan. 664, 79 Pac. 141, a manufacturer sold his own goods by sample. It was held that both sample and goods sold were impliedly warranted to be free from latent defects rendering them unfit for use. In the opinion the court said of the manufacturer:

"He alone knows the details of the process employed; he alone controls it; and he must be deemed to represent that it is reasonably adapted to the end sought, and results in a product free from hidden defects." (p. 667.)

Such a representation bears no resemblance to one that reasonable care was used in the manufacturing process. If the product fail to answer its purpose because of inherent defects, the law charges the manufacturer with knowledge of them. The presumption of knowledge rests on the fact that, if diligence had been used, the defects would have been eliminated, and to permit the manufacturer to plead diligence is to permit him to repudiate his warranty. That the tank company was a manufacturer, within the reason of the doctrine of implied warranty by manufacturers, is made clear by the decision in *Kellogg Bridge Company v. Hamilton*, 110 U. S. 108, quoted with approval in the Nixa-Lehmann case.

The oil company introduced evidence that the tank was constructed without regard to scientific principles which must be applied in order that a tank of that size may resist the pressure on its sides. There was evidence also that some of the hoops were not large enough, and that some of them were defective. The tank company's president testified that his company had no plans or specifications according to which their tanks were constructed, that no one had computed for the company the proper spacing of hoops, and that they did not ascertain the strength of iron before putting hoops in place. The results of "rule of thumb" construction were pitted against mechanics, and the evidence to refute negligent construction took wide range, extending to tank building throughout the entire oil field.

In the case of *Craver v. Hornburg*, 26 Kan. 94, suit was brought on a note given for the price of a Randolph header. The defense was breach of implied warranty, and on this branch of the case the court expressed itself as follows:

"When a machine is ordered from a manufacturer for a specific and understood purpose, it is impliedly agreed that such machine, when constructed, shall be reasonably fit for such purpose; and if upon trial within a reasonable time it proves unfit, the purchaser may return the machine and rescind the contract." (Syl. ¶ 1.)

At the trial the contention that the machine was unfit for the purpose for which it was designed, was abandoned, and the defense was shifted to defective construction. The plaintiff denied defective construction, and claimed the machine was mismanaged. The defendant was permitted to show that other machines purchased from the plaintiff manifested the same defect as the one for which the note was given. The syllabus relating to that subject reads as follows:

"Where the question is, whether the machine purchased as above failed through defect in its construction or in consequence of mismanagement, and the question is by the testimony a doubtful one, it is material error for the court to permit testimony that some other machine furnished by the same manufacturer similarly failed." (Syl. ¶ 2.)

In the opinion it was said:

"Now, over the objection of plaintiffs, the defendant was permitted to show that other machines bought from the plaintiffs manifested a defect similar to that charged against this machine. We think in this respect the scope of the inquiry was improperly enlarged. It is nowhere pretended that the Randolph header as a machine was unfit for the purpose for which it was designed; the claim was, that this particular header was so defectively constructed that it would not do the ordinary work of such machines. Now it does not tend to prove that this machine was defectively constructed, to show that some other machine was also similarly defective. If the defendant could show that any other Randolph header gave the same trouble, then the plaintiffs of course ought to be permitted to show that the difficulty arose from mismanagement and not from defect, and the attention of the jury would be turned to inquiries entirely foreign to the matters involved." (p. 96.)

In the case of *Mfg. Co. v. Nicholson*, 36 Kan. 383, 13 Pac. 597, the court recognized the fact that comparative evidence may have probative force, and the decision in the Craver-Hornburg case was explained as follows:

"In that case the question under consideration was, whether the machine sold defendant, a Randolph header, could do good work; and it was

held error for the trial court to permit evidence to go to the jury tending to show that another Randolph header failed to do properly the work for which it was designed. It is not shown that the headers, whose work was sought to be compared, were of the same pattern or series; the record simply shows that it was another machine whose work was sought to be compared . . ." (p. 385.)

With this modification, the Craver-Hornburg decision states the rule which still prevails in this state in cases of this nature. The buyer of a manufactured article may sustain a charge of defective construction by evidence that other articles of the same class, made by the same manufacturer, were similarly defective. The seller may meet a charge of defective construction by evidence that other articles of the same class, made by the same manufacturer, were free from defects. To go beyond this would violate the rule against introduction of collateral issues. Therefore, at the next trial, the comparative evidence should be limited to behavior of the tank company's 1,600-barrel tanks.

The judgment of the district court is reversed, and the cause is remanded with direction to grant a new trial.