No. 26,001.

THE STATE OF KANSAS, *Appellee,* v. WILL LEVIN and JOHN LEVIN,
*Appellants.*

### SYLLABUS BY THE COURT.

1. LIQUOR LAW—*Prosecution for Manufacturing Liquor—Evidence Sustains
   Verdict.* In a prosecution for manufacturing intoxicating liquor, the evi-
   dence is examined and held sufficient to sustain a verdict of guilt.

2. —————— Alleged misconduct of the jury examined, and held insufficient to
   require a reversal.

Appeal from Hodgeman district court; ROSCOE H. WILSON, judge. Opinion
filed February 7, 1925. Affirmed.

*Albert H. Wilson,* of Jetmore, *J. S. Simmons, Stuart Simmons,* and *Alva L.
Fenn,* all of Hutchinson, for the appellants.

*Charles B. Griffith,* attorney-general, *William A. Smith,* assistant attorney-
general, *Elfreda Kenyon,* county attorney, and *Lorin T. Peters,* of Ness City,
for the appellee.

The opinion of the court was delivered by

HARVEY, J.: John Levin and his son, Will Levin, were found guilty
of violating the intoxicating liquor law on two counts. One count
charged the manufacture of intoxicating liquor and the other count
charged the possession of a still. As to Will, the court set aside the
verdict as to the possession of a still, as not being supported by the
evidence. Verdicts on the other counts were approved and sentences
imposed. Both have appealed. On behalf of Will Levin, it is con-
tended that the evidence is not sufficient to support the verdict on
the count charging him with the manufacture of intoxicating liquor.
On behalf of John Levin, it is contended there should be a new trial
because of misconduct of the jury.

The evidence, in substance, was as follows: John Levin, a man of
foreign birth, lived alone on his farm; the son, Will, was married
and lived about half a mile north on a farm adjoining that of his
father's. Will kept his cattle in the sheds which were near the house
on his father's place; used the pasture on his father's land, and per-
haps farmed the tillable land thereon. Will Levin had a young man,
Fred Sparks, working for him by the month, and either he or Sparks
was at the John Levin place every morning and evening, and per-
haps oftener. Sparks had formerly worked for John Levin and was
familiar with both premises.

On the day of the arrest, the sheriff and other officers, with a

search warrant for both premises, went first to the home of Will Levin. There they found Will Levin and his wife, Fred Sparks, and Fred Jenson. They searched the premises and in the henhouse found two barrels. "These barrels smelled sour and had the appearance of having had mash in them." After searching about the place and finding nothing else that aroused their suspicions, they noticed that Sparks was no longer there. They went out to the road, then south half a mile and into the John Levin place. Just before they got to the John Levin place they saw Sparks get on a horse there and ride rapidly north toward the Will Levin place. At the John Levin place the officers found, about twenty feet east of the house, a wet spot on the ground six or eight feet in diameter where a quantity of mash had recently been poured; near the house was a steel barrel which had recently had mash in it, and another such barrel was in a water tank not far from the house. In the house there was an oven built of brick, stone and mortar on the wood floor. It was about two feet high and of such size that the end of a steel barrel fitted the top of it. In the oven was an oil burner, which was connected with a fuel oil barrel. There was also in the house a galvanized tub which had recently had mash in it and a large wet spot on the floor where mash had recently been emptied, some of which had run through onto the ground outside. About 100 yards from the house in the field was found a coil of copper tubing, about eight inches in diameter and having six coils. This tubing fitted a connection on the barrel found near the house, which in turn fitted the top of the oven. When assembled the articles found made a complete still. It seemed clear that the still had been dissembled and the mash emptied from the barrel and the tub shortly before the officers arrived. The jury might properly conclude that Will Levin sent his hired man, Sparks, to do this or have John Levin do it before the officers could reach there.

Some months before this, Will Levin had been charged with violating the liquor law and had pleaded guilty. He testified in this case, but made no explanation of how the two barrels, which had recently contained mash, came to be in his henhouse. Neither did he claim that they had been used for mixing feed or for any other legitimate purpose.

As to the sufficiency of circumstantial evidence to sustain a verdict, it was held in *The State v. Brizendine,* 114 Kan. 699, 220 Pac. 174:

"When considering on appeal the sufficiency of circumstantial evidence to sustain a conviction of crime, the question before this court is not whether

The State v. Levin.

the evidence is incompatible with any reasonable hypothesis except guilt. That was a question for the jury and the trial court, and the function of this court is limited to ascertaining whether there was basis in the evidence for a reasonable inference of guilt." (Syl. ¶ 1.)

Applying the rule just stated, the evidence was sufficient to sustain the verdict as to Will Levin.

As to John Levin, it is at least tacitly conceded that the evidence was sufficient to sustain the verdict on both counts, but it is contended that there should be a new trial because of misconduct of the jury. This question arises as follows:

The coil and the barrel which fitted the oven, with their connections, and perhaps some other parts of the still, were taken into possession by the sheriff and were offered in evidence. While the jurors were considering on their verdict they requested the court to send the exhibits to the jury room. The court, with the consent of the county attorney and Mr. Wilson, one of the attorneys for defendant (Mr. Simmons, of counsel for defendant, was not present) sent the exhibits to the jury room. The jury made a more thorough examination of the exhibits than was made when they were offered in evidence. One of the jurors put the end of the coil to his mouth and "blowed out half a pint of pretty good looking stuff." They also examined the barrel. "We turned it up and got some stuff out of it. . . . It had quite a smell to it. It smelled like mash had been in it. It had the same smell that we got out of the coil."

Appellant complains very bitterly of this conduct of the jury, and argues that the exhibits should not have been sent to the jury and that the jury had no right to make an independent test of the exhibits, differing in character from that made when they were offered in evidence, or from any testimony pertaining to them.

Obviously the object of sending exhibits to the jury is to enable the jurors to make a more thorough examination of them than it was possible to make when the exhibits were offered in evidence. When a party to an action consents to the sending of exhibits to the jury, it is tantamount to an invitation to the jury on his part to make as thorough an examination of such exhibits as they desire. He is not, therefore, in a position to complain if such "more thorough" examination is made. Neither can he complain, in such a case, if such "more thorough" examination tends to strengthen the evidence against him.

The statute provides that a new trial may be granted when the

jury has received evidence, papers or documents not authorized by the court. (R. S. 62-1603.) Here the court authorized the jury to examine the exhibits, and both the state and defendant consented thereto; hence there can be no error in this respect. As bearing on the question, see *The State v. Watson,* 92 Kan. 983, 142 Pac. 956; *The State v. Shoemaker,* 112 Kan. 805, 212 Pac. 890.

Finding no error in the record, the judgment of the trial court is affirmed.