No. 47,364

GEO. C. CHRISTOPHER & SON, INC., *Appellee*, v. KANSAS PAINT & COLOR CO., INC., *Appellant*.

(523 P. 2d 709)

Opinion filed June 15, 1974.

*Gerald Sawatzky*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause and *Robert C. Foulston*, of the same firm, was with him on the brief for the appellant.

*Milo M. Unruh*, of Arn, Mullins, Unruh, Kuhn & Wilson, of Wichita, argued the cause and *Richard H. Price, Jr.*, of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

OWSLEY, J.: This action was based on the breach of an implied warranty to furnish a suitable paint to prime steel. In a jury trial the plaintiff prevailed, resulting in an appeal by defendant. The principal issue on appeal involves a construction of the rules relating to sales as set forth in the Uniform Commercial Code. (K. S. A. Chapter 84, Article 2.)

Plaintiff is a structural steel fabricating company with its plant in Wichita, Kansas. For many years plaintiff has purchased primer paint from defendant, a paint manufacturer and seller, for use in its structural steel fabricating business.

Plaintiff first heard of a C5A hangar construction project at Altus Air Force Base, Altus, Oklahoma, from the Penner Construction Company of Denver, Colorado. Penner desired plaintiff's assistance in preparing a bid on this project. Further, Penner desired plaintiff's help in the design and formation of the structural steel if it ultimately turned out that Penner was the successful bidder on the general contract.

Penner was awarded the general contract and during the sub-contract bidding procedures plaintiff was told the finish painting contractor desired that plaintiff do its prime painting of the structural steel with a light colored primer. In order to meet that request, plaintiff went to defendant with a request for from 800 to 1,000 gallons of a light gray or off-white primer paint to be used in connection with a large construction project for a contractor in Denver, Colorado. Plaintiff told defendant the project was a hangar. During conversations between plaintiff and defendant at this time, various primer paint specification numbers were discussed, but on each occasion of a number being mentioned defendant advised plaintiff such specification number was not for a light gray or off-white primer paint.

After discussions concerning the various paint specification numbers, plaintiff asked defendant to prepare a formula for a gray oxide primer or an off-white primer that could be used to prime the structural steel for this project and defendant agreed to do so. Plaintiff told defendant this formula would be mailed to various paint manufacturers for the purpose of obtaining bids on such paint so plaintiff would be assured all paint manufacturers would be bidding on the same type of primer paint.

Defendant prepared and delivered the formula requested by plaintiff. This formula was not an exact specification and many kinds of paint could be made from it. The formula was mailed to various other paint manufacturers and suppliers for the purpose of obtaining bids on the type of paint described in the formula. Plaintiff received a number of bids from various paint companies and a bid from defendant.

On July 24, 1970, plaintiff called and advised defendant it was the low bidder, and it would be used as the supplier of the primer paint for the structural steel on the Altus project. Defendant forthwith proceeded to manufacture for the first time the primer paint requested, with a designated number 32X23.

The first of the primer paint was delivered to plaintiff in October of 1970. Deliveries continued during the time plaintiff was fabricating the structural steel for the Altus project. All of the structural steel was fabricated in Wichita, was prime painted in Wichita, and thereafter delivered to the job site at Altus for erection under supervision of the general contractor, Penner.

During the time plaintiff was fabricating and prime painting the steel for the Altus project, it was also fabricating and prime paint-

ing steel for a number of other projects in which plaintiff was then engaged. The same prime painting procedures were used on the other projects as were used in connection with the Altus project, but on none of the others was the 32X23 primer paint used. Paint failures were not experienced on any of the other projects.

After the structural steel was delivered to Altus, parts thereof were erected and parts thereof remained unerected. In early March of 1971, the U. S. Corps of Engineers advised Penner the primer paint job on the structural steel on the Altus project was failing. Penner's representatives examined the job and advised plaintiff the primer paint was wholly unsatisfactory. Penner further stated it would not accept plaintiff's work until the paint problem was corrected and it would hold plaintiff to a strict compliance with its contract. Dissatisfaction on the part of the U. S. Corps of Engineers and on the part of Penner stemmed from the fact the primer paint on both the erected and the unerected steel was rusting, peeling and flaking.

After the paint failure had become apparent, Penner sent some of the 32X23 primer paint to the Hauser Testing Laboratories in Boulder, Colorado, for analysis. The laboratory determined this primer paint, among other things, failed usual and ordinary adhesion and flexibility tests.

While Penner was examining the paint failure, representatives of defendant and of plaintiff also examined the paint and noted the various degrees of paint deterioration. It was agreed, particularly between Penner and plaintiff, that it was absolutely imperative that repairs be made as expeditiously as possible. In connection with such repairs, defendant's chemist stated that in his opinion all the steel would have to be sandblasted, including the steel on the ground as well as that which had been erected.

Plaintiff also took samples of this 32X23 paint to the Means Laboratory in Wichita, which prepared an analysis. Its analysis, among other things, stated this primer paint did not contain a rust inhibitor and that one of its components, calcium carbonate, was not stable under all conditions, which might result in shrinkage on some types of surfaces.

After various conferences between Penner, the U. S. Corps of Engineers, and plaintiff, the parties concerned agreed to a procedure for repair of the primer paint job. In arriving at specifications and procedures for this repair, plaintiff was trying to keep down the costs. Penner ultimately entered into an agreement with the Ray

Martin Painting Company to do the actual repair work. In the opinion of the project engineer for Penner, this was the most reasonable way to effect the repair. Repair was completed and Penner charged plaintiff $112,276.81.

Sometime subsequent to the time all repair was completed, additional samples of the 32X23 paint were tested by Professor James E. Myers, who at the time of the trial was a professor at Wichita State University, but who had previously been the owner, manager and engineer of his own private testing laboratory in Wichita. This same paint, 32X23, was also again tested by Dr. Ray Hauser, owner of the Hauser Laboratories in Boulder, Colorado, who had originally tested it at the request of Penner. Testimony of both Professor Myers and Dr. Hauser was that in their opinion this primer paint, 32X23, was not a satisfactory primer. Dr. Hauser stated it was unsatisfactory for priming structural steel principally because it had inadequate adhesive and inadequate flexibility characteristics. He further testified he ran tests which demonstrated the lack of flexibility and the lack of adhesion which confirmed his earlier tests of this paint in 1971. He testified the paint was easily scraped with a fingernail and the coating did not have good adhesion to even a laboratory panel of steel.

During the trial, Dr. Hauser examined defendant's Exhibit M in open court. Exhibit M was a steel panel which had been painted by defendant in its laboratory with the 32X23 primer paint in issue. He testified he could express an opinion from a test as to whether that particular paint showed good or bad adhesive qualities. He stated that the standard adhesion test for paint involved the use of a knife to scrape loose some of the coating from the material to observe how it removed; i. e., whether it came off in a continuous region. As a result of that examination Dr. Hauser stated it was his opinion the paint did not have suitable adhesive qualities. He had previously stated that adhesion and flexibility are essential in a primer for structural steel. The examination and the test made by Dr. Hauser were in full view of the court and the jury.

Defendant contends the trial court took an erroneous view of the contract between the plaintiff-buyer and the defendant-seller under the Uniform Commercial Code and the undisputed facts. This led to the erroneous overruling of defendant's motions for judgment and a directed verdict, and to errors in evidentiary rulings and instructions. These claims, together with a contention of jury misconduct, are presented under three headings.

## I.

DEFENDANT CONTENDS ITS MOTION FOR JUDGMENT AND A DIRECTED VERDICT SHOULD HAVE BEEN SUSTAINED BECAUSE PLAINTIFF'S SALES TO DEFENDANT WERE WITHOUT ANY IMPLIED WARRANTIES.

K. S. A. 84-2-315 (Uniform Commercial Code) provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

This statutory declaration of the law of implied warranty is basically in accord with case law developed in this state by the following cases: *Stegman v. Offerle Coop. Grain and Supply Co.,* 151 Kan. 655, 100 P. 2d 635; *Rig & Reel Co. v. Oil & Gas Co.,* 111 Kan. 37, 205 Pac. 1020; *Graham v. Bottenfield's, Inc.,* 176 Kan. 68, 269 P. 2d 413; *Tank Co. v. Oil Co.,* 108 Kan. 690, 196 Pac. 1111; *Bowser & Co. v. Bathurst,* 91 Kan. 611, 138 Pac. 585.

Defendant contends the paint was not sold with an implied warranty; first, because the implied warranty was disclaimed and the implied warranty was excluded or modified by a course of dealing or performance, and second, because there was an express warranty that displaced implied warranties. The first argument centers around the disclaimer which appeared on the paint invoices. An observance should be made that the disclaimer was not admitted in evidence and defendant's argument is based on the status of the case if the disclaimer had been properly admitted.

Defendant claims the disclaimer appeared on each of the invoices for the paint sold to plaintiff and the invoices were delivered to plaintiff following each of sixteen orders. It also claims the record discloses this was the manner in which business was conducted between the parties for many years prior to the subject sale. The disclaimer stated:

"The Seller Certifies that the material purchased hereunder has been manufactured in conformity with the Federal 'Fair Labor Standards Act of 1938' as amended.

"Our products are manufactured using materials and processes we believe are the best obtainable. The Company, however, disclaims any warranties, express or implied, particularly since conditions of use are beyond the Company's control. No person is authorized to make any warranty, express or implied."

Defendant further contends such a disclaimer may be made under the provisions of K. S. A. 84-2-316, which provides in part:

"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'

"(3) Notwithstanding subsection (2)

. . . . . . . . . . . . .

"(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade."

Defendant cites K. S. A. 84-1-205, which defines "course of dealing":

"(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

. . . . . . . . . . . . .

"(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement."

Defendant contends the crucial error of the trial court was in failing to recognize the governing nature of the implied warranty disclaimer placed by defendant on its invoices, and in failing to apply the foregoing statutes to the facts. It also contends the trial court failed to give the disclaimers their proper effect in refusing to enter judgment for defendant and in refusing their admission into evidence.

Defendant then states three reasons why any implied warranty was excluded under the terms of 84-2-316:

"1. The disclaimer is a part of the 'course of dealing' between the parties prior to these transactions, and became a part of their agreement under K. S. A. 84-1-205 (3).

"2. There was no complete or enforceable contract covering the sale of all paint needed by plaintiff for the project. Plaintiff's acceptance of a bid for 800 to 1000 gallons was oral (making it not enforceable under K. S. A. 84-2-201), and was not, in any event, the acceptance required by defendant's written bid. Thus, each invoice, which was issued the same day as the delivery ticket, containing the disclaimer, became a part of each such separate sale.

"3. Whether or not there was a contract consummated in July, 1970, the sixteen disclaimers issued in connection with the sixteen deliveries were a part of the 'course of performance,' and thus a part of the agreement under K. S. A. 84-2-208."

The trial court took the position that a contract was made at the

time defendant's bid was accepted and the disclaimer was inadmissible since it was made long after the date of the contract. We agree with the trial court that such a disclaimer cannot affect an implied warranty if the disclaimer was not known to the buyer. Likewise, such a disclaimer could not support a defense based on "course of dealing." This position is supported by the following from *Mack Trucks v. Jet Asphalt, et al,* 246 Ark. 101, 437 S. W. 2d 459 (1969):

"This attempted disclaimer or limitation is ineffective for another reason. The very purpose of the statutory requirement is that any limitation be brought to the attention of the buyer at the time the contract is made. An attempted limitation at the time of delivery long after a contract of purchase is signed does not accomplish this purpose, being a unilateral attempt of a party to limit its obligations. *Zabriskie Chevrolet, Inc. v. Smith,* 99 N. J. Super. 441, 240 A. 2d 195, 5 UCC Rep. Svc. 30 (1968); *Admiral Oasis Hotel Corp. v. Home Gas Industries, Inc.,* 68 Ill. App. 2d 297, 216 N. E. 2d 282, 3 UCC Rep. Svc. 531. See also *Hunt v. Perkins Machinery Co.,* 352 Mass. 535, 226 N. E. 2d 228 (1967)." (p. 109.)

To the same effect is *Cooper Paintings & Coatings, Inc. v. SCM Corporation,* 62 Tenn. App. 13, 457 S. W. 2d 864 (1970), which states the rule in this language:

. . . Moreover and probably controlling is the fact that since this disclaimer of the seller was made after the contract of the sale had been entered into, it must be held to be ineffective to modify the contract. Ford Motor Co. v. Taylor, Tenn. App., 446 S. W. 2d 521; T. C. A. 47-2-314." (p. 867.)

This rule would not apply in a situation where the seller was attempting to use the disclaimers subsequently made known to the buyer to create a defense of "course of performance."

Although defendant questions the existence of a contract at the time its bid was accepted, we are satisfied the parties entered into a binding and enforceable contract. (*Denton v. City of Atchison,* 34 Kan. 438, 8 Pac. 750; *Middleton v. City of Emporia,* 106 Kan. 107, 186 Pac. 981.) Defendant's argument that the contract is unenforceable because it was oral is answered by 84-2-201 (3) (*c*), which recognizes partial performance as a substitute for a required writing. Defendant claims no enforceable contract was made at that time because many essential matters were not covered. We recognize the contractual relationship, if any, must be based on the specifications for the paint and the bid.

K. S. A. 84-2-204 (3) reads:

"(3) Even though one or more terms are left open a contract for sale does

not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

The official UCC comment follows:

"Subsection (3) states the principle as to 'open terms' underlying later sections of the Article. If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of 'indefiniteness' are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like.

"The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions."

We considered the effect of this statute in *Southwest Engineering Co., Inc. v. Martin Tractor Co., Inc.,* 205 Kan. 684, 473 P. 2d 18. We held that the failure to include the terms of payment in a contract did not render the contract unenforceable. We quoted from *Pennsylvania Co. v. Wilmington Trust Co.,* 39 Del. Ch. 453, 166 A. 2d 726:

"'. . . [T]hose drafting the statute intended that the omission of even an important term does not prevent the finding under the statute that the parties intended to make a contract.'" (p. 692.)

The evidence is that on July 24, 1970, plaintiff called defendant and said it was the low bidder on the primer paint contract and that it had the contract. The agreement, consisting of an offer and an acceptance of the offer, was complete. Performance of the contract or the agreement was yet to come, but the agreement was complete. There was no evidence of any kind that the parties negotiated a new agreement on each delivery of paint. The record shows that when plaintiff told defendant it had the primer paint contract, defendant then gave plaintiff the exact number, *i. e.,* 32X23, that had been assigned to the paint; and further, the testimony of defendant's own witness was that it then commenced the manufacture of the paint in question. This was the first time this primer paint (designated 32X23 by defendant) was ever manufactured or sold by it. It seems inconsistent to argue when in July of 1970 defendant's bid was accepted by plaintiff, when it assigned its special number to that paint, when it then commenced the manufacture thereof, that it did not intend the agreement between

itself and plaintiff to be complete, and that it was not then in full force and effect. The periodic deliveries of paint thereafter were but fulfillments of defendant's obligations under the agreement entered into in July of 1970.

Defendant claims the invoices containing the disclaimer were delivered to plaintiff with each delivery of paint and a "course of performance" resulted which modified the contract. Plaintiff claims the record does not support the contention that the invoices were delivered to plaintiff. Regardless of who is correct as to this factual issue, its answer is not necessary to our decision. We have heretofore quoted 84-2-316 (2) which provides that an exclusion or modification of an implied warranty of fitness "must be by a writing and conspicuous." K. S. A. 84-1-201 defines "conspicuous" as:

"(10) 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous.' Whether a term or clause is 'conspicuous' or not is for decision by the court."

The official comment to 84-2-316 reads:

"This section defines the circumstances which are operative to limit warranty liability. Subsections (1) and (2) recognize the right of the seller to contract against warranty liability through appropriate disclaimer provisions. The policy of the Code, however, is to deny effect to disclaimer language which is inconsistent with an express warranty and to permit exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise. . . ."

Although we have dealt with disclaimers in cases arising before the adoption of the Code we have not considered questions relating to the sufficiency of the manner in which a disclaimer is displayed. (*Allen v. Brown,* 181 Kan. 301, 310 P. 2d 923; *Harmon v. Coonrod,* 148 Kan. 146, 79 P. 2d 831; *Steele v. J. I. 'Case Co.,* 197 Kan. 554, 419 P. 2d 902.)

Implied warranties of fitness for a particular purpose are imposed by operation of law for the protection of the buyer and must be liberally construed in favor of the buyer. (K. S. A. 84-2-314, 315; *Woodruff v. Clark County Farm Bureau Coop. Ass'n,* 286 N. E. 2d 188 [Ind. App. 1972].) It is a question of law for the court whether a disclaimer is "conspicuous." (K. S. A. 84-1-201 [10]; *Hunt v. Perkins Machinery Co., Inc.,* 352 Mass. 535, 226 N. E. 2d 228 [1967]; *Sarnecki v. Al Johns Pontiac,* 56 Luzerne Leg. Reg. 293 [1964].)

The disclaimer in this case was a part of the invoice prepared by the seller. In commercial law an invoice is "[a] list sent to a purchaser, factor, consignee, etc., containing the items, together with the prices and charges of merchandise sent or to be sent to him." (Black's Law Dictionary, Revised Fourth Ed., p. 961.) One of the invoices has been reproduced in the record in its original form. The invoice is dated and numbered, describes the merchandise as "32X23 GRAY PRIMER," and discloses the total gallons and the price. The clause containing the disclaimer appears on the invoice in the form heretofore set forth. The clause appears in smaller type than the other information shown on the invoice. It appears in black as does the other information on the invoice. There is nothing on the invoice that directs attention to the clause.

The trial court held the disclaimer was inadmissible. In so doing the court commented that the disclaimer, to be effective, must be displayed on the merchandise. As a blanket rule we do not agree with the trial court since there is no limit under the statute as to the manner in which the disclaimer might satisfy the requirement of being "conspicuous." We do agree with the trial court that the disclaimer was inadmissible. We find, therefore, that as a matter of law the disclaimer under the circumstances in this case fails to comply with K. S. A. 84-2-316 (2) which requires that in order "to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." In reaching this conclusion we have considered the cases annotated in 17 A. L. R. 3rd, § 26, p. 1078, and find them in accord with the foregoing.

Much of what we have said herein would also apply to an implied warranty of merchantability. The court did not, as we interpret the instructions, submit the issue of implied warranty of merchantability. As we view the facts in this case the implied warranty was one of fitness for a particular purpose and an instruction on implied warranty of merchantability was neither proper nor necessary.

Our conclusion is that the disclaimer was inadmissible and as a matter of law it did not exclude or modify the implied warranty of fitness. With the loss of right to show the disclaimer, the whole of defendant's contentions that there was not an implied warranty of fitness fails.

It should be noted that a change in the law relative to disclaimers became effective on January 1, 1973 (K. S. A. 1973 Supp. 50-639, Consumer Protection Act). The new law makes it a decep-

tive trade practice for a seller to "[e]xclude, modify or otherwise attempt to limit any warranty, express or implied, including the warranties of merchantability and fitness for a particular purpose;" nor may any remedy for breach of warranty be excluded. This creates a rather sharp break with portions of the Uniform Commercial Code cited in this case.

Defendant also contends Exhibit 5 (specifications for paint) discloses an intent that the express specifications should supersede any implied warranty under K. S. A. 84-2-317. The statute reads:

"Warranties whether express or implied shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant. In ascertaining that intention the following rules apply:

"(a) Exact or technical specifications displace an inconsistent sample or model or general language of description.

"(b) A sample from an existing bulk displaces inconsistent general language of description.

"(c) Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose."

We cannot agree with defendant's contention. We believe a proper construction of (c) above, controls. Inherent in all the dealings between the parties was an understanding that a suitable paint to provide a primer coat for steel was needed. The specifications, according to all the experts, were not exact or technical specifications. Even if the specifications could be construed as an express warranty, an express warranty cannot displace an implied warranty of fitness for a particular purpose.

## II

Defendant Contends, Alternatively, the Trial Court Erred in Excluding Relevant Evidence and in Its Instructions.

Defendant again asserts the trial court erred in failing to admit in evidence the implied warranty disclaimers found on the invoices (Exhibit V). We discussed this issue under Point I and concluded the disclaimers were inadmissible.

Defendant also complains of the failure of the trial court to admit certain exhibits which were panels painted with a primer allegedly conforming to the federal specifications TTP-6596. This number appeared in the contract between plaintiff and Penner. The trial court instructed the jury that the defendant could not be charged with liability or a failure to furnish a primer paint meeting these federal specifications because there was no evidence to show these

specifications existed or were communicated to defendant until after plaintiff had accepted defendant's bid to furnish the primer paint in question. These exhibits were immaterial and irrelevant to any issue in this action and the jury was so instructed. Reversible error cannot be predicated upon the exclusion of evidence with regard to a matter not in issue.

Defendant claims error in the trial court's failing to admit an exhibit in the form of a daily inspection report written by the U. S. Corps of Engineers, which disclosed the structural steel was not well cleaned prior to painting. This exhibit was offered by defendant without anyone present to testify as to its authenticity. Defendant's complaint with regard to the trial court's rule on this exhibit was that the plaintiff, having listed the exhibit on the pretrial order, should not be allowed to object on an alleged lack of authenticity. The listing of exhibits by parties at a pretrial conference is for identification purposes only. Their authenticity must be provided at the time of trial. The trial court did not err in refusing to admit this exhibit.

Based on what we have previously stated herein, it is our conclusion this case was properly submitted to the jury on the theory of implied warranty for a particular purpose, and the instruction thereon was a correct statement of law and in accord with K. S. A. 84-2-315.

Defendant claims error in the failure of the trial court to give its requested instruction on mitigation of damages. In this case, mitigation of damages would arise after the breach of contract and would require production of some evidence that plaintiff acted unreasonably to enhance the damages caused by the breach. (22 Am. Jur. 2d, Damages, § 33, p. 56.) We are unable to locate in the record any such evidence and in its absence the instruction was properly refused.

Defendant also claims error in the refusal of the trial court to give its requested instruction on avoidable loss. It apparently assumes there is a distinction between avoidable loss and mitigation of damages. Even if we accept this assumption, the record still remains absent evidence to support avoidable loss and the instruction was properly refused.

### III

DEFENDANT CONTENDS THE JURY IMPROPERLY PERFORMED PRIVATE TESTS AND EXPERIMENTS DURING ITS DELIBERATIONS, WHICH CONSTITUTED MISCONDUCT REQUIRING A NEW TRIAL.

In support of its motion for a new trial, defendant filed the affidavit of one of its attorneys stating he had conferred with several jury members following the verdict and that the foreman of the jury had performed certain tests on a paint sample panel submitted as evidence. The foreman scraped paint from plaintiff's exhibit with a pocket knife and discussed these results with the jury; no such tests were performed on defendant's exhibits. The affidavit contends jurors admitted these tests were influential factors in their decision for plaintiff. The trial court denied the motion for new trial saying the facts stated in the affidavit were insufficient grounds upon which to order a new trial. There was no questioning of the jurors themselves, but the facts in the affidavit were not disputed and were accepted as true although held insufficient.

Misconduct of jurors *per se* does not necessitate a new trial, but misconduct which results in prejudice to a litigant and impairs his right to a fair and impartial trial requires a new trial. (*Baker v. Western Casualty & Surety Co.,* 196 Kan. 345, 411 P. 2d 711; *Furstenberg v. Wesley Medical Center,* 200 Kan. 277, 436 P. 2d 369.) It is for the trial court to determine in the first instance whether misconduct on the part of the jury has resulted in prejudice to a litigant, and its judgment thereon will not be overturned unless abuse of discretion is manifest. (*Walker v. Holiday Lanes,* 196 Kan. 513, 413 P. 2d 63; *Furstenberg v. Wesley Medical Center,* supra.) Defendant contends the action of the jury in independently testing only plaintiff's paint panel exhibit was prejudicial to it and cites several Kansas cases in support of its argument. The cases are not relevant because they involve jury gathering of evidence either outside the physical surroundings of the courtroom or outside the scope of the evidence and issues presented for jury consideration. In *Kaminski v. Kansas City Public Service Co.,* 175 Kan. 137, 259 P. 2d 207, several jurors visited the scene of the collision and measured distances; in *Kincaid v. Wade,* 196 Kan. 174, 410 P. 2d 333, jurors followed the woman defendant in a motor accident and reported to other jurors on her driving habits; in *Barajas v. Sonders,* 193 Kan. 273, 392 P. 2d 849, one juror used a slide rule to determine the point of impact and other computations; in *Walker v. Holiday Lanes,* supra, a juror went to the bowling alley, the scene of a slip and fall incident, and reported the results of his independent investigation. These were instances of prejudicial jury conduct because, as the court said in *Kaminski:*

". . . Litigants have a right to expect that with respect to evidence juries will confine themselves to the evidence introduced, and that members of a jury will not engage in any 'extra curricular' activities such as were indulged in here." (p. 140.)

In the case at bar, the jurors duplicated tests performed in the courtroom on exhibits sent with them to the jury room. This instance more closely resembles or parallels the circumstances in *State v. Levin,* 117 Kan. 739, 232 Pac. 1020, where the jury's thorough examination of a still produced half a pint of the forbidden product. When defendant claimed he was prejudiced, the court said:

"Obviously the object of sending exhibits to the jury is to enable the jurors to make a more thorough examination of them than it was possible to make when the exhibits were offered in evidence. . . ." (p. 741.)

An even closer parallel is presented by *Taylor v. Reo Motors, Inc.,* 275 F. 2d 699 (10th Cir. 1960). A poorly manufactured heat exchanger was the alleged cause of a fire. The device was admitted into evidence and went with the jury to the jury room. During their deliberations, members of the jury took the device apart and put it back together, using pocket knives, nail clippers, and other pocket tools. Defendant claimed this was jury misconduct prejudicial to it and moved for a new trial. The court commented on the action of the jurors as follows:

"The salient question is whether the experiment or investigation made by the jury out of the presence of the parties, and while they were deliberating, can be said to be within the scope or purview of the evidence introduced at the trial, or whether it amounts to the taking of evidence outside the presence of the parties. See Annotation 80 A. L. R. 108. If the experiment or demonstration was conducted by the jury for the purpose of testing the truth of the statements made concerning the functioning of the heat exchanger, it was proper. The heat exchanger was offered in evidence. It had been disassembled and reassembled in open court by experts for the purpose of demonstrating negligence or lack of negligence in its manufacture or assemblage. The exhibit was before the jury, and it was permissible to take it to the jury room and examine it for the purpose of testing the validity of statements made in open court in respect thereto. If it had been a written document in fine print, we do not suppose that it would have been improper for the jury to use a magnifying glass in possession of one of them for the purpose of scrutinizing critical language. It therefore does not seem improper for the jury to disassemble this exhibit for the purpose of deciding the issues presented to them." (pp. 705, 706.)

The conduct of the jurors in this case passes the test of *Kaminski* in that they did not stray beyond the confines of the evidence presented to them with their tests, and it also passes the test of

*Taylor* because the purpose of the test was to check the validity of evidence presented in open court. An experiment or demonstration is proper when conducted by the jury with the use of exhibits properly submitted to it for the purpose of testing the truth of statements made by witnesses or duplicating tests made by witnesses in open court.

The trial court correctly denied defendant's motion for a new trial based on alleged jury misconduct.

Affirmed.