No. 22,546.

F. M. KAULL et al., Partners, etc., *Appellants*, v. L. M. BLACKER et al., *Appellees*.

SYLLABUS BY THE COURT.

1. SALE OF FLOUR—*Breach of Warranty—Evidence of Offer to Compromise.* An offer to compromise a difference is not admissible in evidence in an action between the parties concerning that difference, but if the offer to compromise contains an admission of fact, that may be properly introduced in evidence.

2. SAME—*Breach of Warranty—Liability of Seller.* A manufacturer of a grade of flour that is known by him to be extensively used by bakers in making bread, and who sells that grade of flour under a certain name, warrants that the flour sold by him under that name is of the grade and character described thereby, and warrants that it will make bread; and if flour that will not make bread is sold to a dealer under that name, the seller is liable for the damages thereby sustained by the purchaser, and an instruction to the jury to that effect is not erroneous.

Kaull v. Blacker.

3. SAME—*Evidence Supports Verdict*.   The verdict was supported by evidence.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge.   Opinion filed November 6, 1920.   Affirmed.

*C. L. Kagey, Omer D. Smith,* both of Beloit, *E. S. McAnany, M. L. Alden,* and *Thomas M. Van Cleave,* all of Kansas City, for the appellants.

*David F. Carson,* of Kansas City, *Charles M. Blackmar,* and *Henry A. Bundschu,* both of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiffs, millers at Glen Elder, sought to recover from the defendants, dealers in flour at Kansas City, damages that had been sustained by the plaintiffs by reason of the refusal of the defendants to accept and pay for flour that they had contracted to purchase from the plaintiffs.   The defendants, on a counterclaim, recovered judgment for damages caused by the fact that the flour delivered would not make bread.   The plaintiffs appeal.

1.   They contend that the court committed error in refusing to admit certain evidence offered by them.   Part of that evidence consisted of a conversation over the telephone between W. J. Kaull, one of the plaintiffs, and M. A. Blacker, then one of the firm of the Blacker Milling Company, but who died after the conversation occurred.   The administrator of his estate is a party to this action.   The plaintiffs contend that in that conversation M. A. Blacker admitted the liability of his firm to the plaintiffs for the damages sustained by them, to the extent of $800.   The defendants contend that the statements made by Blacker constituted an offer to compromise the differences that had arisen.   Testimony of Mr. Goudy, a witness for the plaintiffs, who "listened in" while the conversation was going on, is shown in the abstract as follows:

"Well, Mr. Kaull called Mr. Blacker over the 'phone and said to him: 'Do you absolutely refuse to accept flour on this contract?' and Mr. Blacker replied: 'Yes, we do not want the flour.'   Then Mr. Kaull asked him: 'Do you want to take the flour from any of the other mills through-

out the state that we can furnish it from?' and Mr. Blacker replied, 'No, we don't want the flour at all,' and Mr. Kaull then said, 'Since you don't want to take the flour at all, we will take this date, the market on this date as our basis for settlement, and this would figure about $1,149.' Mr. Blacker . . . (Defendants moved to strike out the answer and the court ruled that witness could answer.)

"Witness said: Mr. Blacker replied . . .

"Mr. Carson: Wait a minute, I object to that as incompetent, irrelevant and immaterial.

"Mr. Kagey: Probably in fairness to counsel this better be given to the court and counsel and let him determine.

"(Thereupon the following occurred out of the hearing of the jury:)

"Mr. Kagey: Now just give it.

"The Witness: Mr. Blacker replied, 'We cannot do that. We will pay $800 in settlement.'

"The Court: Yes, I think that would be incompetent.

"Mr. Kagey: Of course, we offer that.

"Mr. Carson: We object to that.

"The Court: The objection to the last part will be sustained."

The other part of the evidence excluded was contained in letters written by the defendants to the plaintiffs in additional efforts to settle the controversy. This court is unable to see where, in either the conversation or the letters, there was an admission of liability, although they did contain offers to settle by paying certain amounts of money. If there had been an admission of liability, it could have been introduced in evidence; but if there was no admission of liability, the evidence offered was properly excluded. (*C. B. U. P. Rld. Co. v. Butman,* 22 Kan. 639; *Railroad Co. v. Stone,* 78 Kan. 505, 509, 97 Pac. 471; *Myers v. Goggerty,* 10 Kan. App. 190, 63 Pac. 296; 22 C. J. 308-317.)

2. The plaintiffs complain of the following instruction given by the court:

"If the jury find from the evidence that 'Gold Drop' 95 per cent flour was sold on the market at Kansas City and known and understood by those dealing in it, including the plaintiff and defendant, to be a flour manufactured by removing the bran and feed and 5 per cent of the lower grade flour from the wheat, and that there was no agreement or custom among flour dealers, including plaintiff and defendant, by which said flour was understood to have qualities and constituents which would make it fit and proper to make marketable bread when properly prepared and baked, and that the plaintiff delivered to the defendant flour that was manufactured by removing from the entire product of the wheat the bran and feed and 5 per cent of the low grade flour, then you are instructed

Kaull v. Blacker.

that the delivery of such flour would be a compliance by plaintiff with their contract and plaintiff would be entitled to recover in this action from the defendant; but if you find from the evidence that 'Gold Drop' 95 per cent flour was a flour sold on the market at Kansas City as an article of commerce for use largely if not entirely by bakers for the baking of bread, and was so understood by those dealing in said flour on said market, including the plaintiff and the defendant, at the time of making the contract for the sale of the flour in question in this case by the plaintiff to the defendant, then you are instructed that the plaintiff was bound to deliver to the defendant flour of kind and quality fit and proper for use of bakers for baking bread; and if you find from the evidence that the plaintiff did not deliver to the defendant flour of that kind and quality, but did deliver flour that could not be used by bakers in the baking of bread, and that by reason thereof the defendant was unable to sell to bakers the flour which the plaintiff had delivered to the defendant, and the samples furnished defendant by plaintiff of the flour which plaintiff expected to deliver in the future to defendant, was of the same quality as that already delivered, then you are instructed that the plaintiffs did not comply with their contract and that the defendants were not bound to accept any further delivery of said flour, but had the legal right to refuse to accept it, and your verdict should be for the defendants."

There was evidence to show that "95 per cent flour," was a standard grade, and was extensively, almost wholly, used by bakers in Kansas City in making bread; that "Gold Drop" was the name given by the plaintiffs to the 95 per cent flour manufactured by them; that they contracted with the defendants to sell them "Gold Drop" 95 per cent flour; that the flour delivered was not of the grade called for by the contract; that the defendants were engaged in selling flour to bakers for the purpose of making bread; that part of the flour purchased was sold to bakers in Kansas City; that the flour thus sold did not make bread; and that the defendants were compelled to take it back and furnish other flour in its place. There was also evidence of a chemical analysis of the flour delivered to the defendants from which the jury could have concluded that it was of a quality poorer than that of the grade sold. There was further evidence which tended to show that the plaintiffs and the defendants understood that 95 per cent flour was sold on the market at Kansas City for use largely, if not entirely, by bakers in making bread. That evidence may be detailed as follows.

The plaintiffs in their opening statement to the jury said:

"Now the Gold Drop Flour was a well known flour. The evidence will show that it was a manufactured article of commerce that had been fur-

nished to the trade, the flour trade of Kansas and Missouri for perhaps thirty or forty years, perhaps forty years; that it was a 95% flour; they knew what it was."

In a letter written by the plaintiffs to the defendants this language was used:

"Nearly all old wheat milled after the extreme weather shows some trace of a stacky odor, and we are informed by bakers that it bakes out all right and with no effect therefrom."

James R. Blacker testified that "95 per cent flour is flour with 5 per cent of the low grade extracted, and also the feed extracted, and to us it means in trade it is a standard piece of goods," and that it was sold to the bakery trade almost universally.

Mr. Estabrook, a chemical expert, testified that the trade recognizes 95 per cent flour as standard patent; that that is a trade term for it. John A. Wilson, another chemical expert, testified that there is a grade of flour known as 95 per cent flour, and to his knowledge that has been a grade of flour dealt with on the Kansas City market for probably sixteen years; that he had known of that flour being on the market; that it is a grade of flour generally dealt with on the Kansas City market; and that it was used mostly by the baking trade, although it also goes into family trade in some sections. Witness stated that the baking trade—bakers as distinguished from homes— almost universally used that grade of flour.

Outside of the evidence, it is well known that practically all flour is sold for use in making bread, and that this is the principal use for which flour as such is sold. Small quantities of flour are used for other purposes, but that use is negligible. Because these are facts known by all, the courts take judicial notice of them. (*City of Topeka v. Zufall*, 40 Kan. 47, 49, 19 Pac. 359; 16 Cyc. 852.)

The plaintiffs cite *Ehrsam v. Brown*, 76 Kan. 206, 91 Pac. 179, where this court said:

"Where a known, described and specified article is sold by a dealer under a contract to be executed by delivery of the specified article, which is actually supplied to the buyer, there is no implied warranty that it shall answer the particular purpose intended by the buyer, although such purpose is communicated to the dealer beforehand." (Syl. ¶ 1.)

This rule is supported by *Safe and Lock Co. v. Huston*, 55

Kaull v. Blacker.

Kan. 104, 39 Pac. 1035, and *Telephone Co. v. Telephone Co.,* 83 Kan. 64, 109 Pac. 780.

In *Field v. Kinnear,* 4 Kan. 476, a case that arose over the sale of flour, this court said:

"In an executory contract for a sale of goods by sample it is the privilege of the vendee to return the goods if they do not correspond with the implied warranty, and thereby rescind the contract, or he may retain them and recover damages." (Syl. ¶ 1.)

"In such a contract for goods not yet manufactured, there is an implied warranty that the goods shall fill the terms of the contract." (Syl. ¶ 2.)

In *Bigger v. Bovard,* 20 Kan. 204, a case that arose over the sale of meat, this language was used:

"A vendor impliedly warrants goods sold by him without any opportunity of inspection on the part of the buyer to be of a merchantable quality, and reasonably fit for the purpose intended; and if, when the goods are delivered to the buyer, they are unmerchantable and unfit for use, the buyer may return them without unnecessary delay, and rescind the contract; and if the goods on being returned to the vendor are injured or damaged without any fault or negligence on the part of the buyer, such injury does not prevent a rescission of the contract." (Syl.)

In *Craver v. Hornburg,* 26 Kan. 94, it was said that—

"When a machine is ordered from a manufacturer for a specific and understood purpose, it is impliedly agreed that such machine, when constructed, shall be reasonably fit for such purpose; and if upon trial within a reasonable time it proves unfit, the purchaser may return the machine and rescind the contract." (Syl. ¶ 1.)

In *Lukens v. Freiund,* 27 Kan. 664, it was said that—

"While when an article is ordered from a manufacturer to be by him manufactured for a specific and understood purpose, there is in some cases an implied warranty that the article when manufactured will be reasonably fit for the purpose intended, yet when a purchase is made from him of a specific and completed article he is to be regarded as a dealer and his liability determined accordingly." (Syl. ¶ 2.)

Other cases that have some bearing on this question are *Shaw v. Smith,* 45 Kan. 334, 25 Pac. 886, and *Nixa v. Lehmann,* 70 Kan. 664, 79 Pac. 141. Extended notes on implied warranties of articles of food sold will be found in 22 L. R. A. 195, 15 L. R. A., n. s., 884-893, and L. R. A. 1917 F, 472-475.

It must be conceded that when flour is sold, it is sold for use in making bread; there is, therefore, an implied warranty

that it will make bread. It follows that if flour sold will not make bread, the purchaser may return it and collect the damages sustained by him.

The evidence justified the instruction that has been set out, and there was no error in giving it.

3. The plaintiffs argue that the verdict was contrary to the evidence. This argument is based on the contention that there was no evidence to show that the flour delivered was not of the kind and character called for by the contract. The evidence to prove that fact has been summarized under the discussion of the complaint of the plaintiffs concerning the instructions. That evidence was sufficient to support the verdict of the jury.

The judgment is affirmed.