No. 44,125

CHESTER O'BRYAN, *Appellee,* v. HOME-STAKE PRODUCTION COMPANY, *Appellant.*

(403 P. 2d 978)

Opinion filed July 10, 1965.

*Richard W. Moss,* of Augusta, argued the cause, and *Franklin D. Gaines,* of Augusta, was with him on the brief for the appellant.

*James B. McKay, Jr.,* of El Dorado, argued the cause, and *J. B. McKay,* of El Dorado, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: Three alleged errors arising out of a jury trial comprise the subject matter of this appeal.

Appellee sued for and was awarded a monetary judgment for damages for loss of use of portions of his land by reason of pollution from oil and salt water, fence and gate damage, inconvenience, expenses incurred in mitigating damages, and for punitive damages, all as a result of appellant's alleged wrongful conduct in operating and developing an oil and gas lease on appellee's real estate. The land is a 160 acre farm used for stock raising and grazing purposes on which, pursuant to a written lease, appellant conducted operations over a period of approximately two years, drilling three producing oil and gas wells and three input wells with surface lead lines and pipe lines conveying oil and salt water.

Appellee sued for $4,000.00 actual damages and for $8,000.00 punitive damages.

The jury awarded appellee a recovery in the total sum of $2,-181.00, and in answer to special questions itemized the same as follows:

"1. Fence and gate damages ............................. $90.00
"2. Damage for inconvenience suffered by plaintiff as a result of defendant's acts ................................... 250.00
"3. Damages for temporary loss of use of plaintiff's land ..... 460.00
"4. Expense of the plaintiff in connection with his attempt to mitigate the damages ............................. 25.00
"5. Punitive damages ................................. 1,356.00"

On *voir dire* examination of the jury, the prospective jurors were asked a series of general questions by the court and by counsel for both parties. The court inquired whether any of them actually thought they knew the real estate involved in the action, whether there were any who professed to know anything about the case or had heard or read anything about it, whether they would follow the court's instructions as to the law of the case, and whether they knew of any reason why they could not serve as fair and impartial jurors, "to all of which questions proper answers were made by each juror." Counsel for appellee then asked the prospective jurors whether or not they had ever "been involved in any similar litigation," whether any had ever served on a jury in a similar case, and whether or not any of them had ever worked as a pumper or anything of that nature, "to all of which questions proper answers were

given." Counsel for appellant then asked whether any had ever been parties in "some type litigation which might prejudice you," and whether or not they felt that they were possessed of a state of mind that they would like a juror to be in if sitting as plaintiff and someone else were sitting where they were as a jury, "to which questions proper answers were given."

Upon hearing of a motion for new trial filed by appellant, one juror testified he had served as foreman of the jury; that he was a graduate chemical engineer and pharmacist, and that he had been a paid professional witness in a good many pollution cases. Further he testified:

"Q. So, in effect you possessed some considerable knowledge about what this particular law suit would be about?

"A. Oh, I would say that was a reasonable conclusion.

"Q. Mr. Childs, I have one additional question. How did the jury go about arriving at land damages?

"A. They took the pictures and went over the pictures and every one of them had a different idea on what the land damage was and I think that there was one of the instructions from the Judge to arrive at land damage, if my recollection is correct, and it was the judgment of the whole jury what the land damage was. That wasn't put on paper. That was a discussion between all of us, there was a wide divergency about what the land damages was.

"Q. The issue in question I raise at this particular time is, did you, according to your particular information and knowledge, feel that this particular land might have been polluted and cause the plaintiff's cattle to become ill and sick?

"A. Are you asking me for my personal conclusions?

"Q. Was this discussed?

"A. Yes, it was.

"Q. Was this the deciding factor?

"A. I don't think so. I don't know of any individual thing. I think the advantage we have with a lot of people, and I think this was a rather reasonable jury, we come from varied and different stratas of professional and educational training, some had college, some didn't have, but we used *ordinarily* common sense in the arrival on the land damage and it was the arrival of the whole jury.

"Q. My question is, Mr. Childs, you undoubtedly possess knowledge the rest of the jury didn't possess due to your training and qualifications.

"A. That could be a conclusion I would have some knowledge some didn't have.

"Q. Mr. Childs, at the risk of repeating myself, it was the decision of the jury and they did determine from their deliberations that the land had been polluted?

"A. Right."

Upon oral argument we are told that in individual questioning of the panel not recorded by the reporter the juror in question did state his occupation had been a chemist.

Appellant's motion for new trial was overruled and it urges first that this was error because of misconduct of a juror.

Every litigant in a jury trial is entitled to a trial before an impartial jury but a jury verdict should not be set aside and a new trial ordered on account of partiality on the part of one of the jurors unless this is clearly made to appear. (*Armer v. Nagels*, 149 Kan. 409, 413, 87 P. 2d 574.)

Here there is no suggestion or indication in the record of any impropriety in the jury room, any consideration of independent facts or of any improper effect of the juror's participation. In this regard it appears that nearly all of the jurors who sat in the case were subpoenaed into court by appellant at the time it presented its motion for new trial, yet nothing improper was developed and no partiality was shown.

Can it be said that the failure of the juror to state that he did have knowledge the rest of the jurors did not possess and that he was a graduate chemical engineer and had been a paid professional witness in a good many pollution cases misled and deceived the appellant and thereby impaired his right to challenge?

In *Kerby v. Hiesterman*, 162 Kan. 490, 178 P. 2d 194, this court held:

"When a prospective juror, on *voir dire* examination, gives a false or deceptive answer to a question pertaining to his qualifications with result that counsel is deprived of determine whether the juror is impartial, and the juror is accepted, a party deceived thereby is entitled to a new trial even if the juror's possible prejudice is not shown to have caused an unjust verdict." (Syl. ¶ 3.)

The questions asked the jury panel here were of a very general nature. One was whether any had ever "been involved in any similar litigation." Was this of such a specific nature as to require disclosure as to experience as a witness? It is a fairly common practice for some attorneys and some courts, in order to determine whether a prospective juror may be prejudiced and therefore disqualified from serving, to inquire on the *voir dire* examination whether he has been involved *as a party* in prior litigation. (See anno. 63 A. L. R. 2d 1061; see, also, 4 Schweitzer, Trial Practice, § 667, p. 2024 [1954].) Emphasis seems to be upon involvement *as a party*. Here we can see that that interpretation would be placed upon the particular question both by lawyers and persons familiar with jury trials. This conclusion is further shown by the fact that the question under discussion was thereafter followed by a question whether "any had ever been *parties* in 'some type liti-

gation which might prejudice you.'" (Our italics.) Doubtless this latter question could only be designed to refer to some other type litigation than oil and gas pollution, and was a natural follow-up or extension of the previous question. Emphasis throughout seems to have been upon *parties*, and the conclusion is inescapable that the question under consideration was understood by all to refer to involvement *as a party* in any similar litigation. Hence we cannot say that deception was intended or that it resulted. At the least the questions asked were not sufficiently clear or specific to require our holding that the answers given were false or deceptive, or that the failure to answer in some other way was objectionable to the extent sought. We think this case falls within the purview of that which was said in *Johnson v. Colorado Interstate Gas Co.*, 182 Kan. 474, 322 P. 2d 781, to the effect that:

". . . a party cannot be heard to complain of misconduct of a juror when that party fails to make it appear that the juror lied in his answers to questions on his *voir dire* examination or that the party was deceived so as to be deprived of further opportunity to determine whether the juror was impartial." (Syl. ¶ 1.)

Appellant next urges that the trial court committed error in admitting, over objection, evidence which was in the nature of a compromise settlement. Both sides cite and rely on *Kaull v. Blacker*, 107 Kan. 578, 193 Pac. 182, in which it was said:

"An offer to compromise a difference is not admissible in evidence in an action between the parties concerning that difference, but if the offer to compromise contains an admission of fact, that may be properly introduced in evidence." (Syl. ¶ 1.)

The testimony objected to consisted of conversations at various times between appellee and appellant's foreman, area foreman and superintendent. In substance it appears that appellee made complaint of various items of damage soon after they occurred and was told that appellant would fix the gates, repair the fence, blade down ruts, furnish 100 pounds of grass seed for planting and eventually pay $50.00 besides, but that it wanted to wait until after all the wells were completed. Appellee testified that nothing was done and that in his last conversation he was told appellant "felt" he was owed nothing and that if he got anything from appellant he would have to get it the hard way. We have reviewed this testimony carefully and cannot say that it simply represented an offer in behalf of appellant to buy peace or to compromise a disputed claim.

There was no denial of liability in the conversations. We think that the offers made did contain factual admissions of responsibility for the acts complained of, especially in view of the close connection in point of time with the various items of damage complained of and the particular conversations, and the court committed no error in receiving the testimony. (See *McComas v. Clements*, 137 Kan. 681, 21 P. 2d 895.)

Appellant's last contention is that the trial court erred "in not sustaining appellant's demurrer to the evidence to the extent of the total damage testified to by the plaintiff." The record does indicate that appellant demurred to appellee's evidence, but it fails to show the grounds for this demurrer or the specific reasons presented to the trial court in support thereof. In its brief appellant makes substantially the following argument: Appellee sought damages for the temporary loss of use of his pasture land for a period of two years; he testified that a total of eleven acres of his land had been damaged as a result of appellant's drilling operations and that such land would rent for $5.50 per acre; appellant argues appellee is bound by his own testimony, and therefore, the maximum land damage for eleven acres at $5.50 per year for two years would amount to only $121.00, whereas the jury awarded $460.00 for this item. By this argument we understand appellant contends its demurrer was intended to reach any amount beyond that to which it contends appellee thus limited himself. Appellee responds to this by pointing out that appellant has misconstrued his testimony in that he, appellee, testified that during the first year he tried to use his pasture, and that he was unable to use eleven acres by reason of appellant's operation, such acreage having a reasonable rental value of $5.50 per acre per year, making $60.50 damages for the first year, and that during the second year, having lost three cows and a calf from drinking bad water, he was unable to use any of his 160 acres of pasture which at a rental value of $5.50 per acre would give him a damage of $880.00 for the second year, or a total for the two years of $940.50, more than twice the amount the jury allowed.

The record on appeal does not support the narrow interpretation appellant seeks to place on appellee's testimony by virtue of two isolated answers, but rather it reveals the version contended for by appellee. Moreover, in addition to appellee's own testimony, loss of use of a considerable acreage was also shown by the testimony

of a veteran cattleman who testified in appellee's behalf. Hence no error can be predicated in the ruling on appellant's demurrer. Appellee's evidence showed damage for loss of use of his land over a period of two years and the exact amount was a question of fact for the jury to determine under proper instructions.

Appellant's statement of points contains two other purported trial errors which are not mentioned in any way in the brief and hence these are treated as abandoned.

No error appearing in any of the trial court's actions, its judgment is affirmed.

APPROVED BY THE COURT.