NOT DESIGNATED FOR PUBLICATION

No. 126,363

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BOOT HILL GAME BIRDS, LLC,
*Appellant*,

v.

KANZA COOPERATIVE ASSOCIATION,
d/b/a IUKA FEEDS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Ford District Court; ANDREW STEIN, judge. Oral argument held March 5, 2024. Opinion filed September 13, 2024. Affirmed.

*Randall K. Rathbun*, of Depew Gillen Rathbun & McInteer LC, of Wichita, for appellant.

*Allen G. Glendenning*, of Watkins Calcara, Chtd., of Great Bend, for appellee.

Before SCHROEDER, P.J., ISHERWOOD and PICKERING, JJ.

PICKERING, J.:  Boot Hill Game Birds, LLC (Boot Hill) sued Kanza Cooperative Association, d/b/a Iuka Feeds (Iuka), alleging that a catastrophic number of bird deaths on its farm was due to defective feed purchased from Iuka. Boot Hill asserted claims of negligence, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability. Iuka moved to exclude Boot Hill's expert's testimony and moved for summary judgment, and the district court granted both of Iuka's motions. On appeal Boot Hill claims that the district court erred in finding Iuka's general manager's statement of responsibility immaterial, erred in its analysis of Boot Hill's

1

expert's opinion, and erred in granting summary judgment. Based on our review of the record on appeal, we find no error and affirm.

BOOT HILL'S CLAIMS AGAINST IUKA FEEDS

Phil Huffman owns and operates Boot Hill, a farm outside of Dodge City. Huffman purchased the business in 2010 and by 2018 he was selling nearly 40,000 birds a year, including quail and chukar. Boot Hill bought hatchlings and raised them to adults for sale. Boot Hill purchased feed for its birds from Iuka. Initially, the feed Iuka sold to Boot Hill contained a non-ionophore coccidia medication called Deccox. Sometime prior to 2019, Boot Hill switched to a feed containing the feed additive Bio-Cox, which contains salinomycin, an ionophore-based medication. Boot Hill claims the switch was unnecessary, ill-advised, and based on Iuka's advice.

In the summer of 2019 almost 25,000 birds died. Boot Hill sued Iuka, claiming Iuka's feed caused ionosphere toxicosis in the birds, resulting in their deaths. Boot Hill claimed that 11 tons of feed was defective because portions of it contained too much Bio-Cox, i.e., there was insufficient mixing. The parties agreed that there can be ionophore toxicity even when Bio-Cox has been properly mixed. In fact, the parties agreed that quail are more sensitive to certain medications than other species and that quail are very sensitive to the ionophores used in Bio-Cox. But Boot Hill claimed this still did not explain the massive die-off at the farm.

Boot Hill identified two experts: Dr. Amanda May, who provided an expert report, and Dr. Steve Ensley, who did not. Boot Hill's expert disclosure stated that Ensley was a "fact witness" who "may offer expert opinions."

Dr. May is a Doctor of Veterinary Medicine. She provided care for Boot Hill's birds since 2011. In her affidavit attached to Boot Hill's response to Iuka's summary

2

judgment motion, she opined that Boot Hill "lost almost 25,000 quail and chukar most likely caused by improperly mixed feed from Iuka Feeds." She stated: "On September 24, 2019, Mr. Huffman and I sat down with Jeff May and Randy Dowling from Iuka. Mr. Dowling was very upfront with us, stating: 'We know we messed up. We are going to do whatever we need to do to make this right.'" Iuka denies this statement was ever made.

Some of the feed was tested. The parties did not disclose how the feed samples were selected or how much feed was tested. Both parties agreed that "[n]o significantly elevated levels of Bio-Cox were found in the submitted feed samples." As noted by the district court, according to Dr. May, if the test samples showed substantially lower concentration levels than the prescribed Bio-Cox concentration of 60 parts per million, "then there must [have been] concentration levels higher than 60 parts per million elsewhere in the feed. This is the 'hotspot' theory by which Dr. May conclude[d] that the feed was defective."

Iuka moved for summary judgment, claiming there was no genuine issue as to any material fact and that it was entitled to judgment as a matter of law. In the same motion, Iuka moved to strike Dr. May's testimony, asserting her expert opinions were not based on sufficient facts or data and she failed to demonstrate that her opinions were the product of reliable principles and methods. Iuka pointed to the fact that Dr. May conceded that "[n]o significantly elevated levels of Bio-Cox were found in any of the submitted [feed] samples."

Iuka also presented alternative explanations for the deaths of the birds, stating that "the record contains undisputed evidence of [] undisputed causes of ionophore toxicity—Denagard and sulfa." Denagard was prescribed by Dr. May and added to the birds' water on July 18, 2019. The death losses increased dramatically by July 22, 2019. Iuka asserted that using Denagard and sulfa medications on quail increases the risk of ionophore toxicity. Boot Hill countered by claiming that "Denagard applied to the feed made no

3

difference in the amount of bird death from pen to pen," while still conceding that "[u]sing Denagard is contraindicated when ionophore medications are being administered."

Boot Hill did not contradict the following significant facts:

- Boot Hill did not know if all the feed that was tested was from the loads for which their claim was made.
- Feed sample results may not be indicative of actual levels of feed additive and this fact is common and published in the literature.
- Boot Hill's expert did not know what the variability tolerances for ionophore testing in feed were.
- Boot Hill's expert did not know if any of the feed test results were within the expected tolerance.

After the hearing on Iuka's motion to exclude Dr. May as an expert witness, the district court issued a written order excluding Dr. May's opinion. The court ruled that Boot Hill "failed to meet its burden to prove that Dr. May's opinion regarding the feed is sufficiently reliable."

As to the statement allegedly made by Dowling expressing responsibility for the deaths of the birds, the district court found that it was hearsay but admissible under the exception for a party's admission against interest. Yet because it found that the statement could not affect the determination of whether the feed was, in fact, defective, the court ultimately concluded that the statement was immaterial.

The district court found that Boot Hill failed to demonstrate that the feed was defective and failed to demonstrate how the feed could have caused ionophore toxicity. Therefore, Boot Hill could not establish negligence, breach of the implied warranty of

4

fitness for a particular purpose, or breach of the implied warranty of merchantability. The court granted summary judgment to Iuka, which Boot Hill appeals.

BOOT HILL RAISES THREE ISSUES ON APPEAL

I.      The DISTRICT COURT DID NOT ERR IN FINDING IUKA'S GENERAL MANAGER'S ADMISSION IMMATERIAL

Boot Hill challenges the district court's finding that Dowling's alleged admission expressing responsibility for the deaths of the birds was immaterial. The court found that the admission was immaterial because the statement could not affect the determination of whether the feed was, in fact, defective.

*Standard of Review*

An appellate court reviews a district court's determination of materiality de novo. *Castleberry v. DeBrot*, 308 Kan. 791, 812, 424 P.3d 495 (2018).

*Determining Whether Dowling's Statement Was Material*

The threshold determination for the admission of evidence in any proceeding is relevance. *Kansas City Power & Light Co. v. Strong*, 302 Kan. 712, 729, 356 P.3d 1064 (2015)*.* "'Relevant evidence'" is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The definition of relevance has two components: "materiality and probativeness." *Kansas City Power & Light Co.*, 302 Kan. at 729. "Materiality concerns whether the fact to be proved has a legitimate and effective bearing on the decision of the case." *State v. Holman*, 295 Kan. 116, Syl. ¶ 6, 284 P.3d 251 (2012). In determining probativeness, "the question is whether the offered evidence has any tendency in reason to prove a disputed material fact." 295 Kan. 116, Syl. ¶ 6. In other

5

words, material evidence is what "tends to establish a fact that is at issue and is significant under the substantive law of the case." *State v. Robinson*, 306 Kan. 431, 436, 394 P.3d 868 (2017).

Relevant to this case, for a negligence cause of action, a party "must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered." *Legleiter v. Gottschalk,* 32 Kan. App. 2d 910, 913, 91 P.3d 1246 (2004).

Notably, our courts have found that a party's admission is "binding and conclusive" on the party when the statement is "uncontradicted and unexplained." *Brooks v. Dietz*, 218 Kan. 698, Syl. ¶ 7, 545 P.2d 1104 (1976). Indeed, our courts consider "admissions against interest made by a party are the strongest kind of evidence and override other factors." *Kraisinger v. C.O. Mammel Food Stores*, 203 Kan. 976, 986, 457 P.2d 678 (1969). Still, when the statement is "relied on to establish negligence or assumption of the risk as a matter of law[,] the facts revealed thereby and inferences to be drawn therefrom must be viewed in the light most favorable to the party making the admissions." *Brooks*, 218 Kan. 698, Syl. ¶ 7.

*Boot Hill argues the alleged admission was material.*

Boot Hill contends that an admission by a party can supply an element of the cause of action. As such, Boot Hill claims the district court should have found Dowling's statement material in determining whether the feed was, in fact, defective.

In support, Boot Hill relies on 29A Am. Jur. 2d, Evidence § 757, which states: "Admissions by a party opponent are admissible as substantive evidence or for impeachment purposes unless some other exclusionary rule applies." Substantial evidence has been defined as being of "such legal and relevant evidence as a reasonable

6

person might accept as being sufficient to support a conclusion." *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169, Syl. ¶ 3, 630 P.2d 1131 (1981). In other words, Boot Hill is arguing that Dowling's statement does support the element of its cause of action and thus is material.

To further boost its contention that the district court erred in denying the admittance of Dowling's statement, Boot Hill turns to *O'Bryan v. Home-Stake Production Co.*, 195 Kan. 213, 403 P.2d 978 (1965). In *O'Bryan*, the defendant conceded specific defects that needed repair and promised to make those specific repairs—fix defective gates, repair damaged fence, blade down ruts, and furnish grass seed. Our Supreme Court found the assertion that the testimony of the defendant offering to repair damages contained factual admissions of responsibility and thus was properly admitted at trial. 195 Kan. at 217-18.

Boot Hill, however, fails to address how *O'Bryan* applies here. There is no factual admission of liability from the statement allegedly made by Dowling and no offer to pay damages—unlike the defendant in *O'Bryan*, who laid out specific means to address the needed repairs.

Boot Hill also points us to *Schwartz v. Abay*, 26 Kan. App. 2d 707, 995 P.2d 878 (1999), as "[a]nother case involving an admission of negligence by a defendant." There, another panel of this court addressed whether expert medical testimony was required in determining whether a doctor deviated from the standard of care after the doctor admitted operating on the wrong vertebrae. The *Schwartz* panel found that under the facts of that case, the common knowledge exception applied and an expert was not required to determine lack of reasonable care after the doctor's admission. 26 Kan. App. 2d at 710-11; see *Hiatt v. Groce,* 215 Kan. 14, Syl. ¶ 2, 523 P.2d 320 (1974) (explaining common knowledge exception). Yet we do not find *Schwartz* pertinent to the matter at hand as

*Schwartz* does not help us determine whether the district court erred in not admitting Dowling's statement.

Instead, we look at a more relevant case, *Davis v. Greischar Living Trust*, No. 109,110, 2013 WL 5188441 (Kan. App. 2013) (unpublished opinion). There, after discovering live termites and structural damage, a homeowner sued Stevens, the licensed termite inspector who had conducted the preclosing inspection, for professional negligence. According to the homeowner's testimony, Stevens returned to the property and "repeatedly stated, 'I can't believe I missed that.'" 2013 WL 5188441, at *1. Stevens also allegedly told the realtor, "'I screwed up.'" 2013 WL 5188441, at *1.

To avoid summary judgment against him, the homeowner asserted that expert testimony was not needed because Stevens admitted his mistake. The *Davis* panel disagreed: "We view the standard of care required of a termite inspector in Kansas as technical and outside the ordinary experience and common knowledge of a jury." 2013 WL 5188441, at *7. Without the required expert testimony, the *Davis* panel ruled that the homeowner had failed to establish what was the duty of care. More importantly, the panel held that Stevens' admissions—although binding on a party—did not alone constitute proof of negligence. Because the record contained no evidence as to what the professional standard of care was for a termite inspection, the panel found there was no way of determining whether the admissions established a breach of that duty of care. 2013 WL 5188441, at *5.

Similarly, here, Boot Hill argues that the alleged admission by Dowling that "'we messed up'" necessarily proves the element of breach of duty in his negligence action and thus is material. But the *Davis* decision instructs us an admission alone does not establish the breach of the duty of care; thus, Dowling's admission certainly is not material in establishing whether the birds perished because the feed was, in fact, defective.

8

Furthermore, while the termite inspector in *Davis* acknowledged that he had made the admission, here, Dowling refutes the statement was ever made.

Iuka correctly argues that Dowling's alleged statement "'we messed up'" is "vague and ambiguous." Messing up and admitting to liability are not interchangeable. Here, the alleged admission fails to address the critical issue—was there evidence of a defect in the feed that was the cause of the birds perishing? The admission—which Dowling does not admit to making—has no legitimate and effective bearing on the decision of the case and is therefore immaterial.

Even if considered, the statement is not enough for Boot Hill to overcome summary judgment. Dowling's alleged admission does not supply the elements of the standard of care for mixing bird feed with ionophore-based medication or its breach. For that, as the *Davis* decision explains, the court must rely on reliable expert testimony. "Generally, when plaintiffs are attempting to establish negligence based upon a departure from the reasonable standard of care in a particular profession, expert testimony is required to establish such a departure." 2013 WL 5188441, at *4. Viewed in the light most favorable to Boot Hill, the district court did not err in denying the admission of Dowling's statement.

II.     THE DISTRICT COURT DID NOT ERR IN EXCLUDING BOOT HILL'S EXPERT FROM TESTIFYING

On appeal, Boot Hill challenges the district court's rulings under 2022 Supp. K.S.A. 60-456(b) that denied the admission of proposed testimony of Dr. May and Dr. Ensley.

*Standard of Review*

An appellate court applies an abuse-of-discretion standard when reviewing "'a trial court's decision to admit or exclude expert testimony.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); see *In re Care & Treatment of Cone*, 309 Kan. 321, 325, 435 P.3d 45 (2019). "That standard applies as much to the trial court's decisions about *how* to determine reliability as to its ultimate conclusion." (Emphasis added.) *Kumho Tire Co.*, 526 U.S. at 152.

A.     *The District Court Used the Correct Standard to Determine the Reliability of Dr. May's Expert Opinion*

The parties do not dispute Dr. May's qualifications as an expert. Rather, Boot Hill contends that the district court erred in finding Dr. May's feed theory opinion was unreliable. Boot Hill first argues that the district court erred by applying the *Daubert* factors in making its reliability determination. See *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Boot Hill asserts that the district court should have determined the reliability of Dr. May's opinion by applying factors outlined in *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 495, 369 P.3d 966 (2016).

The district court and the parties refer to the "*Aguirre* factors" in their filings and later in the court's order. While *State v. Aguirre*, 313 Kan. 189, 197, 485 P.3d 576 (2021), does adopt these factors, that case relates to determining the reliability of an expert's opinion based upon his "specialized knowledge" and the application of the factors listed under K.S.A. 2020 Supp. 60-456(b). For clarity purposes, we will refer to the factors outlined in *Smart* as the "*Smart* factors."

10

*A trial court is the gatekeeper of expert testimony.*

The statutory provision regarding expert testimony standards, K.S.A. 2023 Supp. 60-456(b), outlines a court's gatekeeping role:

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

As K.S.A. 2023 Supp. 60-456 instructs, a district court is required first to assess whether the expert is qualified "'by knowledge, skill, experience, training or education'" to render an opinion. See *Smart*, 52 Kan. App. 2d at 494. Next, a district court must evaluate whether the proposed expert testimony is relevant and reliable. "The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152. In making the reliability determination, courts have considerable leeway. Without this broad discretion,

> "the trial judge would lack the discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." 526 U.S. at 152.

11

*The basis for an expert's opinion dictates which set of factors a court should apply when making a reliability determination.*

When an expert's opinion relies on a scientific theory, a court applies the *Daubert* factors to assist the court with its gatekeeping obligation to ensure that scientific evidence is relevant and scientifically reliable. Thus, in making this reliability determination, a district court may use several nonexclusive factors: whether the theory or technique can and has been tested; whether it has been subject to peer review; the rate of error; the existence and maintenance of standards; and whether the theory or technique has general acceptance among the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

And when considering an expert's opinion based on "specialized knowledge," K.S.A. 2023 Supp. 60-456(b) instructs that the court should determine whether the testimony is based on sufficient facts or data; whether the testimony is the product of reliable principles and methods; and the witness has reliably applied the principles and methods to the facts of the case. See *Aguirre*, 313 Kan. at 208 (finding district court failed in applying its gatekeeping role by permitting botanist with specialized knowledge of plant life to present an "'open grave'" theory, "which was not the product of reliable principles and methods reliably applied to the facts of the case.").

A court's reliability inquiry may also focus on the expert's "personal knowledge or experience" when that serves as the opinion's basis. *Kumho Tire Co.*, 526 U.S. at 150. In *Smart*, 52 Kan. App. 2d at 496, a panel of this court considered how a district court should determine the reliability of an expert opinion that was based on the expert's experience. The panel reviewed the district court's exclusion of a liability expert who based his testimony on his experiences as an expert in ergonomics. Considering federal caselaw, the *Smart* panel outlined the reliability factors that a witness must address when relying primarily on experience:  The expert "'must explain how that experience leads to

12

the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" 52 Kan. App. 2d at 495.

Applying this set of factors, the *Smart* panel reviewed the record to determine whether the expert explained how his experience, including the professional studies on which he relied, led to his conclusions, why his experience provided a sufficient basis for his opinions, and how his experience was reliably applied to the facts. Based on this analysis, the *Smart* panel upheld the district court's ruling that excluded the expert. The Kansas Supreme Court has cited these *Smart* factors "with approval." *Aguirre*, 313 Kan. at 197.

Consequently, in deciding which set of factors to apply in determining reliability, a court must understand the basis for the expert's opinion, i.e., scientific theory, specialized knowledge, experience or personal knowledge. 313 Kan. at 204-05; *Smart*, 52 Kan. App. 2d at 495. Having established this framework, we move to the district court's reliability determination of Dr. May's opinion and its decision to apply the *Daubert* factors.

*The district court performed its gatekeeping role using the proper standard.*

The district court began its analysis by determining whether the court could focus its reliability concerns on Dr. May's personal knowledge and experience by applying the *Smart* factors instead of the *Daubert* factors. At first, the court did consider how Dr. May's experience led to the conclusion reached, why Dr. May's experience was a sufficient basis for the opinion, and how that experience was reliably applied to the facts. The court specifically stated that although Boot Hill did not "even assert that Dr. May bases her opinion on personal knowledge and experience . . . , the Court turns to the record of the case to first identify if Dr. May's opinions are based upon personal

13

knowledge and experience, and if so," then to apply the factors outlined in *Smart*. The district court's order stated:

> "Dr. May's opinion in controversy is that Defendant failed to mix the Bio-Cox into the feed properly and this failure caused the deaths of Plaintiff's birds. The Court has carefully reviewed Dr. May's affidavit, the selections of Dr. May's deposition available to it and the written summary of Dr. May's expected testimony. There is simply no explanation anywhere as to Dr. May having any personal knowledge or experience relevant to the process of mixing bird feed or otherwise having personal knowledge of industry standards for mixing feed. Therefore, … to determine the reliability of Dr. May's opinion about the proper mixing of the feed [the Court] … *must instead apply the* Daubert *factors*." (Emphasis added.)

Boot Hill argues that the district court should have applied the *Smart* factors and not those under *Daubert* because "Dr. May opined that she has more experience than most veterinarians in handling aviary problems, . . . Dr. May used her experience in arriving at a scientific explanation for what caused these bird deaths." Boot Hill also contends that "[t]he fact that Dr. May had no experience in mixing feed is irrelevant."

Boot Hill relies on *Tonn Family Ltd. Ag. Ptnshp. v. Western Ag. Ins. Co.*, No. 120,933, 2021 WL 1045206 (Kan. App. 2021) (unpublished opinion). In *Tonn*, an insurance company challenged on appeal the admission of the homeowner's expert's testimony that the damage to the homeowner's roofs was caused by hail. The insurance company claimed that the expert, a civil engineer experienced in forensic investigations, was not qualified because "'he never had a specific course or training in hail damages[,]' . . . was 'unable' to answer certain hypothetical questions posed by defense counsel during his deposition and was unable to point to any specific articles regarding what to look for in determining whether clay tiles were damaged by hail." 2021 WL 1045206, at *8.

The *Tonn* panel held that the district court appropriately performed its gatekeeping duty under K.S.A. 2020 Supp. 60-456(b). The expert testified that he performed a visual inspection and examined "'the roof slopes, the orientation of the roof slopes, [and] the condition of the various materials[,]" as well as considering "the material properties of the clay tiles, the installation method of the tiles, the decking material used to support the tiles, the material used to fasten the tile to the decking, and the historical exposure to the elements based on weather reports." 2021 WL 1045206, at *8-9.

This case is quite different from *Tonn*. There, the expert was a civil engineer, who was experienced in forensic investigations. He "used his education as a civil engineer and experience in materials research as well as forensic investigations to render his opinions." 2021 WL 1045206, at *9. Accordingly, the panel in *Tonn* used the personal knowledge and experience factors identified in *Smart*. 2021 WL 1045206, at *8. Here, Dr. May's expert opinion provided a scientific explanation for what caused these bird deaths. The district court attempted to evaluate Dr. May's "hot spot" theory under the *Smart* factors. However, as the court noted in its order, without an explanation of "Dr. May having any personal knowledge or experience relevant to the process of mixing bird feed or otherwise having personal knowledge of industry standards for mixing feed[,]" the court was unable to apply the *Smart* factors. Instead, the court found Dr. May's "hot spot" theory was better suited for the *Daubert* scientific factors to ensure that her proposed scientific evidence was relevant and scientifically reliable. See *Daubert*, 509 U.S. at 589.

Even if the district court had considered the *Smart* factors, Dr. May failed to explain how she used her experience or knowledge to arrive at her conclusions. She asserted that she "did graduate studies in Monogastric Nutrition with an emphasis in poultry nutrition" and that she had "multiple clients with game bird operations, small scale poultry operations and exotic birds." But there was no explanation for how that experience led to the conclusions she reached, why that experience was a sufficient basis for her opinion, or how that experience was reliably applied to the facts. See *Smart*, 52

15

Kan. App. 2d at 497. Accordingly, the district court did not err in ultimately analyzing Dr. May's opinion under the *Daubert* factors.

B.       *The District Court Properly Excluded Dr. May's Expert Opinion*

Having established that the district court correctly considered the *Daubert* factors, our inquiry is next focused on the district court's "determination of reliability." See *In re Care & Treatment of Cone*, 309 Kan. at 327.

At the district court, Iuka challenged Dr. May's proposed testimony as "amount[ing] to nothing more than speculation and her *ipse dixit*." Iuka also challenged Dr. May's methods, arguing that her methods likewise consisted of nothing more than speculation. For purposes of its motion, Iuka had conceded that the cause of death of the birds was ionophore toxicity. Iuka's argument was that Dr. May's expert testimony lacked relevance and reliability: "Defendant challenges the reliability of Dr. May's opinions that: (1) the feed was defective; and (2) the defect in the feed caused the ionophore toxicity."

The district court then applied its broad discretion in determining the reliability of Dr. May's opinion through applying the *Daubert* factors. The court order outlined how the court then proceeded to review Dr. May's theory or technique that she used "to reach her conclusion that the Bio-Cox feed was defective and then applie[d] the *Daubert* factors."

Boot Hill argues the district court erroneously excluded Dr. May's opinion when it applied the *Daubert* factors. The party asserting an abuse of discretion has the burden of showing such abuse. *First Nat'l Bank of Omaha v. Centennial Park*, 48 Kan. App. 2d 714, 721, 303 P.3d 705 (2013).

Boot Hill asserts that Dr. May's opinion on the hotspots in feed "is based on science and an obvious fact." Boot Hill then claims that the "simple laws of physics" explain that "when you add a coccidiostat to feed you need to make certain it is properly mixed." It seems Boot Hill is arguing that expert testimony is not required at all for its claim of negligence, rather than arguing that Dr. May's testimony was reliable under *Daubert*. The common-knowledge exception, however, "does not apply . . . when the matter is technically complicated." *Davis*, 2013 WL 5188441, at *6. The standard of care required for mixing medicated feed is outside the ordinary experience and common knowledge of a jury. See *Davis*, 2013 WL 5188441, at *7.

We begin by looking back at the facts supporting Dr. May's opinion. Boot Hill alleged that 11 tons of Bio-Cox feed was defective. One or more samples of the Bio-Cox feed were sent to labs for testing. The prescribed concentration level of Bio-Cox to feed was 60 parts per million. One test resulted in a Bio-Cox concentration level of 59 parts per million. All other tests revealed concentrations levels below 50 parts per million—the amount recommended by the label for quail.

According to Dr. May's "hotspot" theory, the district court explained:  If "the test samples show[ed] substantially lower concentration levels [than 60 parts per million], then there must be concentration levels higher than 60 parts per million elsewhere in the feed." The district court found: "In explaining her theory, Dr. May recognizes there are expected variances in feed testing samples." Still, the district court noted, Dr. May was "unaware of what the acceptable variances are. She states that sections of feed containing undetectable levels of Bio-Cox would not fall within normal variances, but offers no basis for this opinion." The district court found that Dr. May concluded that "the cause of ionophore toxicity is most likely related to an issue with the feed."

Under the principles of *Daubert*, a plaintiff is required to show that the proposed expert witness' method chosen for reaching the conclusion is both scientifically sound

17

and that the opinion is based on facts which sufficiently satisfy K.S.A. 60-456(b)'s reliability requirements. See *State v. Lyman*, 311 Kan. 1, 28-29, 455 P.3d 393 (2020). As such, Boot Hill needed to show that Dr. May's method used in reaching her opinions was scientifically sound and that her opinions were tied to the facts that satisfy the reliability requirements. Boot Hill did not meet this requirement. It did not present evidence that Dr. May's "hotspot" theory was tested or subjected to peer review.

As noted by the district court's order denying Dr. May's expert testimony, there was no evidence that a particular standard by which to judge the theory existed. Further, Dr. May did not explain how samples were taken or how those samples could reliably indicate variances across 11 tons of feed. She did not assert that her theory had gained any widespread or general acceptance. In other words, her theory does not meet the *Daubert* standards for reliability. And this reliability criterion remains a discrete, independent, and important requirement for admissibility. *Lyman*, 311 Kan. at 29; *In re Cone*, 309 Kan. at 327.

Based on our review of the record, we find that the district court performed its gatekeeping duty as required by K.S.A. 2023 Supp. 60-456(b). Applying the appropriate standard, we find the district court did not abuse its discretion in excluding Dr. May's testimony as an expert witness.

C.     *Boot Hill challenges the court's failure to consider Dr. Ensley's opinion.*

Boot Hill also raises an issue that the trial court erred in not considering the opinion of Dr. Ensley. However, Dr. Ensley never submitted an expert report, and Iuka correctly notes that Dr. Ensley did not offer an opinion on the central issue of whether the feed was defective. The record on appeal does not include an affidavit or a summary of expected testimony for Dr. Ensley as it does for Dr. May. Dr. Ensley was listed in plaintiff's expert disclosure as a "fact witness who may offer expert opinions during the

18

course of his testimony." The citations in Boot Hill's brief to the record where this issue was raised are to Dr. May's affidavit, where she states that she consulted with Dr. Ensley.

Boot Hill's brief cites to no legal authority for its position that a district court errs in failing to consider an opinion when the expert was described as a fact witness and offered no opinion. Failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief an issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018).

III. The DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO IUKA

*Summary Judgment and the Standard of Review*

> "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling is sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo." *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

Appellate courts review "the district court's denial of a motion for summary judgment de novo, viewing the facts in the light most favorable to the party opposing summary judgment." *H.B. v. M.J.*, 315 Kan. 310, 313, 508 P.3d 368 (2022). If reasonable

19

minds could differ about the conclusions drawn from the evidence—if there is a genuine issue about a material fact—then summary judgment should be denied. 315 Kan. at 313.

*Determining Whether Summary Judgment Was Appropriate*

Boot Hill asserts that there remain questions of fact on its claims for breach of warranty of fitness for a particular purpose and breach of implied warranty of merchantability, precluding summary judgment against it. Then, rather than pointing to evidence that calls into question a material factual representation made in support of the motion for summary judgment, it simply concludes: "It seems obvious . . . that the game bird feed was defective and was not fit for the ordinary purpose for which it was intended." Boot Hill then states that "[t]his, however, is a question for the jury." But whether Boot Hill can survive summary judgment is a matter of law that the trial court could determine upon admitted facts. See *GFTLenexa, LLC*, 310 Kan. at 981-82.

Summary judgment is rarely appropriate in negligence cases, unless the plaintiff fails to establish a prima facie case demonstrating the existence of the four elements of negligence: "existence of a duty, a breach of that duty, an injury, and proximate cause." *Montgomery v. Saleh*, 311 Kan. 649, 653, 466 P.3d 902 (2020).

To prevail on a claim of breach of the implied warranty of merchantability, "a plaintiff must show that the purchased goods were defective, that the defect was present when the goods left the seller's control, and that the defect caused the injury sustained by the plaintiff." *Hodges v. Johnson*, 288 Kan. 56, 68, 199 P.3d 1251 (2009). Here, Boot Hill admits that to demonstrate a breach of the implied warranty of merchantability, it must show that the feed it purchased from Iuka was defective.

Similar to the implied warranty of merchantability, to recover for breach of the implied warranty of fitness for a particular purpose, "it must be established that a defect

20

causing damage was present when the product left [seller's] control." *Linscott v. Smith*, 3 Kan. App. 2d 1, 7, 587 P.2d 1271 (1978); see K.S.A. 84-2-315. Yet the parties admitted that test samples of the feed did not contain elevated levels of Bio-Cox.

Boot Hill seemingly argues that because a large number of birds died, the feed *must* have been defective. As Iuka points out, "'Negligence is never presumed.'" *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141 (1997). The mere existence of a massive bird die-off does not establish negligence or breach of the implied warranties of merchantability and fitness for a particular purpose. The trial court correctly analyzed the issue:

> "[Boot Hill] alleges that Bio-Cox in the feed it received from [Iuka] caused ionophore toxicity in and the death of thousands of [Boot Hill's] birds. For [Iuka] to be liable, [Boot Hill] must first demonstrate that the feed was defective. [Boot Hill] fails to do this. [Boot Hill] offers no evidence of a standard by which feed must be prepared. [Boot Hill] does not offer any evidence that any of the feed contained significantly elevated concentration levels of Bio-Cox or in any way failed to meet an industry standard for quality. [Boot Hill] instead argues the deaths themselves prove the feed was defective. However, the record contains no evidence that demonstrates how the feed could have caused ionophore toxicity. Because [Boot Hill] fails to offer any evidence that the feed was defective, or to explain how a defect in the feed caused the bird deaths, it cannot prove [Iuka] is liable under any of its three alternative theories."

Boot Hill "must produce sufficient evidence from which a reasonable person could say that, on the whole, it is more likely than not that the defendant was negligent." *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 134, 795 P.2d 915 (1990).

In *Smart*, the panel found that Smart could not show the necessary element of liability of BNSF without the testimony of its sole liability expert and his testimony of poor working conditions. The panel explained that even if it had "agreed with that

21

assertion [of error in excluding the causation expert's testimony], Smart's failure to present some evidence raising a genuine issue of material fact as to the negligence of BNSF compel[led] the [district court to grant] summary judgment to BNSF." 52 Kan. App. 2d at 501-02.

Similarly, Boot Hill failed to present evidence establishing Iuka's liability. Without evidence from Boot Hill establishing that the acts of Iuka caused its injury, Boot Hill did not raise a genuine issue of material fact. The district court properly granted summary judgment.

Affirmed.